**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL JOHN RODRIGUES, | CASE NO. 12-cv-02831-YGR |
| Petitioner, | |
| vs. | ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS |
| RON BARNES, | |
| Respondent. | |

**INTRODUCTION**

Petitioner Michael John Rodrigues, a state prisoner, brings the instant petition for writ of habeas corpus pursuant to 28 U.S.C. section 2254, challenging his 2009 conviction. (Dkt. No. 10.) A San Benito County jury convicted Petitioner, a former San Benito County Sheriff's Department Sergeant, of three counts of forcible rape (Cal. Penal Code § 261(a)(2)), and one count of spousal rape (§ 262) involving three complaining witnesses. Petitioner raises twelve grounds for the petition, alleging ineffective assistance of counsel on various bases, as well as erroneous admission and exclusion of evidence by the trial court.

Respondent Ron Barnes has filed an answer and a memorandum of points and authorities in support thereof. (Dkt. No. 36.) Petitioner has filed a traverse. (Dkt. No. 43.) Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby **DENIES** the petition for the reasons set forth herein.

**PROCEDURAL HISTORY**

Petitioner was found guilty of three counts of forcible rape (Cal. Penal Code § 261(a)(2)), and one count of spousal rape (§ 262) involving three complaining witnesses. The jury acquitted petitioner on three other sex offense charges involving a fourth complaining witness. On November 20, 2009, petitioner was sentenced to four consecutive terms of 15 years to life imprisonment, or 60 years to life, in state prison under the One Strike Law, California Penal Code

section 667.61, subds. (b) and (e)(4).

Petitioner appealed from that conviction and filed a petition for writ of habeas corpus with the California Court of Appeal. (Original Federal Habeas Petition, Attachment 2.) On May 18, 2011, the California Court of Appeal affirmed the judgment of conviction and denied the petition for writ of habeas corpus. (Respondent's Exhibits Lodged February 21, 2013 ["REL"], Exh. 4.) On August 24, 2011, the California Supreme Court denied the petition for review of the direct appeal (REL Exh. 6) and denied the petition for review of the habeas corpus petition.

On June 1, 2012, petitioner filed his original federal petition for writ of habeas corpus. (Dkt. No. 1.) On January 31, 2013, petitioner filed a first amended petition for writ of habeas corpus, adding six claims, and thereafter requested a stay pending the exhaustion of state remedies as to his unexhausted claims, which this Court granted. (Dkt. No. 10.)

Petitioner filed a second petition for writ of habeas corpus in the San Benito County Superior Court. (Respondents' Supplemental Exhibits Lodged September 15, 2017 ["RSEL"], Dkt. No. 36-3, Exh. 11.) On October 16, 2016, the Superior Court found the second petition to be timely and otherwise denied the petition. (*See* RSEL Exh. 12, Dkt. No. 36-4 at 18.) Petitioner then filed a petition for writ of habeas corpus with the California Court of Appeal. (RSEL Exh. 12.) That petition was summarily denied on February 1, 2017. (RSEL Exh. 13.) On March 29, 2017, the California Supreme Court denied the petition for review. (RSEL Exh. 14.)

Once those additional claims were exhausted, the First Amended Petition herein was deemed filed as of January 31, 2013. (Dkt. No. 22 ["First Amended Petition"].)

On May 13, 2017, this Court issued an Order to Show Cause as to the First Amended Petition. Respondent filed its answer and brief in support thereof on September 15, 2017. (Dkt. No. 36, ["Oppo."].) Petitioner filed his traverse on February 15, 2018. (Dkt. No. 43["Traverse"].)

The Amended Petition raises twelve claims: (1) ineffective assistance of counsel ("IAC") based upon trial counsel failing to object to improper expert testimony on rape trauma syndrome; (2) IAC based upon trial counsel failing to cross-examine prosecution rape trauma syndrome expert adequately; (3) IAC based upon trial counsel failing to investigate and present expert

testimony on rape trauma syndrome adequately to counter the prosecution expert's testimony; (4) IAC based upon trial counsel failing to investigate and present expert testimony on witness reliability; (5) IAC based upon trial counsel failing to impeach Doe 1's credibility adequately; (6) the trial court's erroneous exclusion of a declaration from petitioner's former wife, "Kristi" impeaching her trial testimony in violation of petitioner's constitutional rights to confront the witnesses against him, to present a defense, and to due process of law; (7) IAC based upon trial counsel failing to seek admission of those portions of Kristi's declaration relevant to impeach her trial testimony, her other statements to the police, and her credibility; (8) the trial court's erroneous admission of evidence of prior sex offenses to prove criminal disposition in violation of due process; (9) prosecutorial misconduct during argument in violation of petitioner's constitutional rights to the effective assistance of counsel and to due process of law; (10) IAC based upon trial counsel failing to object adequately to prosecutorial misconduct during argument; (11) IAC based upon appellate counsel failing to raise meritorious claims of prosecutorial misconduct; and (12) cumulative prejudice in violation of due process based upon all the foregoing.

## UNDERLYING FACTS

The Court adopts as its account of the facts the summary set forth in the last reasoned opinion in this matter, the California Court of Appeal's decision on direct review of Petitioner's conviction.[1] This summary is presumed correct. *See Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

### Counts I and II

Jane Doe met [petitioner] in 1999 when he was looking for a missing dog in the apartment complex where she lived. They eventually entered into an intimate relationship. [Petitioner] typically visited Jane at her apartment in the early morning hours after his shift. He would arrive in his patrol car, wearing his uniform. One day, Jane received a telephone call from a woman who identified herself as [petitioner]'s wife, Kristi. Jane told Kristi that she knew that the Mikey Rodrigues she was going out with was not married. Approximately two months into Jane's relationship with [petitioner], after she got to know him better, she told

---

[1] *People v. Rodrigues*, No. H035024, 2011 WL 1885367 (Cal. Ct. App. May 18, 2011) (unpublished opinion) (REL Exh. 4).

[petitioner] that she did not want to see him anymore. He then called her several times a day wanting to still see her, and he came to her apartment repeatedly and knocked on her door.

Sometime in middle to late 1999, [petitioner] came to Jane's apartment and insisted on coming inside, even after she told him that she did not want him to. He repeatedly rang the doorbell, opened and closed the mail slot, and pounded on the door until she let him in. He came inside and, while they were talking, he walked Jane backwards into her bedroom. She sat down on the bed and told him that they had to break off their relationship. He proposed marriage and she told him no. He tore off her underwear and penetrated her vagina with his penis even though she said that she did not want to have sex with him. Afterwards, she was able to push him away. He laughed and left the apartment, and she locked the door behind him.

A similar thing happened months later, in the winter of 2000. Jane was on her break at work when [petitioner] called her on her cell phone and insisted on seeing her on her lunch hour. She agreed to meet him at her apartment. When she got there, she told him again that she did not want to see him anymore. Once again he proposed marriage. He pushed her against the couch in her apartment and pulled down her pants. He took off her underwear and penetrated her vagina with his penis even though she said, "No. Don't. Leave me alone." However, this time when Jane pushed [petitioner] away, he hit his head on the edge of a chair. He got up, got dressed and left. Jane did not see [petitioner] again.

Jane never reported the two incidents involving [petitioner] until a Hollister police officer came to her home one day and questioned her about him.

**Count 3**

Kristi met [petitioner] in September or October 1994. She was driving home from a baby-sitting job when she noticed a patrol car following her. When she pulled over, she asked [petitioner], the officer in the patrol car, if she had done something wrong. They had a conversation and began dating shortly thereafter. They married in May 1996.

About four years later, Kristi noticed some unfamiliar phone numbers on [petitioner]'s cell phone bill. She called one of the numbers that had showed up more than once, which turned out to be Jane Doe's work number. Kristi asked Jane Doe why the phone bill showed the number being called "in the wee hours of the morning." Jane Doe said that [petitioner] had been calling and visiting her. In the summer of 2005, John Klauer, a licensed private investigator, advised Kristi on how to look up information about people online. Kristi had told John that [petitioner] had been unfaithful to her.

Kristi testified that one night in February 2006, she and [petitioner] were in bed, starting to have sex, when "[i]t got a little scary, weird kind of." [Petitioner] acted like "someone I had never seen before." He pulled off her

clothes and grabbed her hair. "[H]e held my hair and asked me if I liked it like that." She responded "No. No." She told him to stop and she tried to push him away but he continued. He held her down and he forced her legs open with his hands, causing a bruise on her inner thigh. He penetrated her vagina with his penis, ejaculated, and then went to sleep. She was frightened and "in shock." "[L]ike I said, I never saw that side" of him. The next morning, Kristi told Anisha Klauer what had happened. Anisha told her that it was a form of rape and that she needed to report it. Kristi did not report it because "[i]t was my husband."

Anisha testified that she met Kristi when their husbands worked together at the Sheriff's Department. One Saturday morning in February 2006, Kristi called Anisha and said that the night before [petitioner] had raped her. Kristi said that [petitioner] had held her down in bed by her hair and forced her legs apart. When she told him no, and to stop, he continued, causing her to have bruises on her thigh. Kristi said that she had never seen that side of [petitioner] before and that she was really shocked. Anisha told her husband John Klauer what Kristi had said and he told Anisha to tell Kristi to report it to the police. John also said that if Kristi did not want to report it to the police, she should call the sheriff's department because that was [petitioner]'s employer. Kristi told Anisha that she was afraid to report it because she did not think that anything would be done about it.

Some time after this incident, detectives from the sheriff's department interviewed Kristi during their investigation of [petitioner]. At that time, Kristi told the detectives essentially what she testified to at trial. At the direction of the sheriff's department, Kristi also reported the February 2006 incident to the Hollister Police Department. Anisha did not make a report of Kristi's phone call until Hollister police officers questioned her following Kristi's report of it to them.

Kristi and [petitioner] started marriage dissolution proceedings and she and her children moved into her parents' home. She also got a restraining order against [petitioner]. One night, when Kristi had been drinking, [petitioner] called her but she would not answer the phone. [Petitioner] then came and knocked on the door and looked in the windows. Because her child's friend was with her, and Kristi did not want the friend to have to walk home while [petitioner] was outside, Kristi put the children in the car and drove down the street. She was pulled over by a Hollister police officer and told to get out of the car. She was arrested for suspicion of driving under the influence, but the charges were dismissed after she filed a motion arguing that it was an unlawful stop, "because the arresting officers listened to, at the time, the estranged husband of myself, Mr. Rodrigues" and "they never contacted me or talked to me...."

As a result of the incident, Kristi lost custody of her children and was allowed only supervised visits with them for six hours every Saturday. After she attended alcohol rehabilitation, she tried to get custody of her children back, but the family court told her that she had to attend AA for a longer period of time first. Kristi was devastated, and she told [petitioner] that she would do anything to

get her children back. [Petitioner] asked her to talk to his defense investigators, and she did so in September 2008. She answered their questions and they typed up a statement for her to sign. She read it and signed it. The statement was "true and honest." Soon thereafter, Kristi was allowed overnight visits with her children, and she entered into a 50–50 custody agreement with [petitioner] as part of their judgment of dissolution against the advice of her attorney.

Kristi testified that at the time of [petitioner]'s trial, she was living with Brian Cain. Cain testified that he and Kristi were living together and that they have a child together. Their relationship started while Kristi was separated from [petitioner] and living with her parents. Cain has known [petitioner] for 15 years, and he was friends with both [petitioner] and Kristi while they were married. Cain further testified that, one Saturday in February 2006, Kristi called Cain and said that [petitioner] had got on top of her in bed and pulled her sweat pants down. He had held her by the hair and had said "Is this how you want it every night?" She had said, "No, no, no. Stop, stop," but he had kept going. Kristi said that she had sustained a couple of bruises on her leg from being held down.

**Count 9**

Lee B. was introduced to [petitioner] by her boyfriend, and [petitioner] sent her an email on her birthday in September 2006. She did not know at first who the email was from, because [petitioner] used the name Mark, but he sent her various clues and she figured it out. [Petitioner] then called her repeatedly, saying that he would like to get together and to get to know her. In mid-October 2006, when she was home alone and in a great deal of pain after having had a tooth extracted, she told [petitioner] that he could come over for a few minutes. When [petitioner] arrived, he gave her a hug and said, "It's good to see you."

Lee's children sleep in her front room, so she does not do any entertaining there. Therefore, Lee took [petitioner] to her bedroom. They sat on opposite ends of the bed and watched television and talked. Then [petitioner] unbuckled his belt and started to pull his pants down. Lee asked [petitioner] what he was doing. He responded, "What do you think I'm doing." She told him, "No, I'm not going to do this, I don't want to have sex with you." She said that she did not know him and that she was in a lot of pain. She jumped off the bed and ran around it towards the bedroom door, repeatedly saying no. [Petitioner] grabbed her by the arm, said that nobody tells him no, pulled her back, and threw her down on the bed. He kept her pinned to the bed with her hands over her head while he removed her sweat pants. She repeatedly told him no and struggled to get away. He penetrated her vagina with his penis and ejaculated. She was horrified; she thought that he had just raped her and that there was nothing she could do about it because he was a deputy sheriff. She started to cry and said, "That was not a very nice thing you just did to me." [Petitioner] left, saying that he'd be in touch. Lee told her friend Susan about the incident soon after it occurred.

Subsequently, [petitioner] repeatedly called Lee, sometimes 10 or 11 times a day. She would not answer the phone for days on end. When she did finally

answer the phone, [petitioner] talked her into seeing him again. They eventually began an intimate relationship, and they were still seeing each other when [petitioner] was being investigated on other charges. The sheriff's office contacted her in October 2007, and she told [petitioner] about the contact when she was on her way to talk to the investigating officers. [Petitioner] told her that, if she really loved him, she would do the right thing for him and protect him. Therefore, Lee did not tell the detectives the truth that day. She told them that she knew [petitioner] and that the person they were describing was not the person she was seeing.

After Lee spoke to the detectives, she spoke to [petitioner] and told him: "Well, honey, I just lied for you. And they asked me if I would take a lie detector test, and I told them yes." [Petitioner] responded: "Don't worry. You won't have to." Lee said, "If I ever have to go to court for you, I will not lie for you then." Lee spoke to a detective from the sheriff's office again in 2008, after she had stopped seeing [petitioner]. She told the detective then that she had lied the first time to protect [petitioner]. This time she told the detective the truth, which is what she testified to at the trial.

Susan Hirtreiter testified that she was living with Lee in October 2006, when Lee told Hirtreiter that [petitioner] came to their home and forced her to have sex with him. Lee appeared withdrawn, but she did not complain of any physical injuries. Hirtreiter told Lee that she should report it. Lee did not report it at that time.

**The Evidence Code Section 1108 Evidence**

**Misty R.**

Misty R. testified that she dated [petitioner] for six to eight months in 1993, before she turned 18. She first met [petitioner] when she was driving home from work one evening and he followed her for a while in his patrol car and then pulled her over. The same thing happened again. Misty could not remember what [petitioner] said to her but he did not give her a ticket either time. They went out to dinner on their first date. She told him how old she was and he told her that he was 32.

They had intercourse between five and ten times. At times it would become violent. [Petitioner] hit her in her chest, back, arms or legs at times, and once he held a gun to her head. He told her on several occasions that he would kill her and hide her body so that nobody would find her. She did not tell anyone about the incidents. When she tried to end their relationship, [petitioner] sat outside her work in his patrol car, followed her, and left her threatening phone messages. She was finally able to break off her relationship with [petitioner] after [petitioner] started seeing Kristi. A few years later, when she was working as a reserve Marina public safety officer, she reported the incidents to the sheriff of San Benito County.

**John Klauer**

At the time of trial, John Klauer had been a reserve, or part-time, deputy sheriff for 17 years. He knew [petitioner] through that employment. In May 2004, [petitioner] was John's supervising sergeant when he asked John to go to a motorcycle gang task force event in Laughlin, Nevada with him. John drove them down and they shared a hotel room. They arrived on a Friday and met with other members of the task force on Saturday. On Saturday night, they went out drinking with other off-duty officers. John had five to seven drinks over the course of five to six hours. Around 3:30 a.m., [petitioner] stated that he was going back to their hotel room. As John was walking back to their hotel about 20 minutes later, he encountered [petitioner] talking to a woman in the parking lot near the hotel lobby. [Petitioner] "was kind of groping her, holding her hand, had his arms around her." It appeared to John "that based on her demeanor and her dress, ... she was most likely a drug addict and probably a prostitute as well." John said that he was going to go to bed and he left, but he saw [petitioner] entering the hotel with the woman.

John went to the hotel room alone, got ready for bed, got into the bed furthest from the door, and went to sleep. Around 15 or 20 minutes later, he heard the door to the room open and people enter. After a minute or two, John looked over and saw that [petitioner] was fully dressed but the woman had her jeans off. When [petitioner] saw that John was awake, he threw the woman on top of John's bed and said, "Fuck him...." John immediately pushed the woman away and told [petitioner] to get her out of the room. [Petitioner] grabbed the woman and took her to the other bed, and John went back to sleep.

A few minutes later, the woman approached John and whispered in his ear that she did not want to have anything to do with [petitioner]. John told her to leave. [Petitioner] grabbed the woman by the arm and took her into the bathroom. John got up and listened at the bathroom door. He heard [petitioner] say, "Well, if it's cocaine you want, I can go out and get you some." The woman said that she did not want to do anything, and then John heard some rustling noises. He returned to bed. He heard [petitioner] and the woman leave the bathroom, stand at the foot of [petitioner's] bed, more rustling noises, and the woman scream, "No. Stop. Leave me alone."

John saw that both [petitioner] and the woman were naked. The woman was lying on her stomach on the bed. [Petitioner] was on top of her holding her arms over her head and trying to penetrate her. She was trying to avoid the penetration by moving her body and she continued to scream for him to stop. [petitioner] said, "John, come over here and hold this bitch down for me." John got up, grabbed [petitioner] off the woman, and swore at him. He told [petitioner] that he had to get the woman out of the room. The woman yelled at both John and [petitioner]. [Petitioner] grabbed the woman by the arm and threw her, naked, out of the room.

[Petitioner] threw the woman's clothes and purse out to her over the next couple of minutes while she banged on the door. John yelled at [petitioner] that he had to leave. [Petitioner] dressed and, three to four minutes after the woman left, he left. John then went back to sleep. [Petitioner] returned to the room around 8:00 a.m., and told John that it was time to leave. They showered and drove home,

during which they did not say much to each other. John told an internal affairs officer about the Laughlin incident in July 2004. Because the woman had not reported the incident, so it would be John's word against [petitioner's], nothing further was done. John told Kristi about the Laughlin incident in early 2006.

**The Rape Trauma Syndrome Evidence**

Jenny Adler, volunteer and counseling coordinator at the Silicon Valley YWCA Rape Crisis Center, testified as an expert in rape trauma syndrome. She did not conduct any investigation in this case and she did not know the specific charges against [petitioner]. She described rape trauma syndrome as "a common set of reactions that rape victims tend to experience following a sexual assault." It is a way of understanding the experiences of rape victims; it is not a diagnosis.

There are three "stages" to the syndrome. The first stage is "crisis impact," the second stage is "reorganization," and the third stage is "resolution." During the crisis impact stage, "there's a lot of shock and denial." A lot of victims will not report the sexual assault because they either do not realize that that is what happened or they are trying to pretend that what happened was not a sexual assault. A victim might also begin or continue a relationship with the perpetrator. Then "a crash . . . occurs." The victims "usually end up going into a place of despair and depression that's much worse than they have known before in their life." "You can see anxiety attacks starting at that point. You can see a difficulty with eating, having difficulty sleeping, having nightmares, someone may develop a lot of phobias at that point." During the reorganization stage, the victims "become reorganized to accommodate the experience that they have had. . . . [T]hey are trying to continue in their daily life but having a lot of symptomology of someone who has gone through a sexual trauma." During the resolution stage, the victims "finally regain a sense of stability in their li[ves]. . . . You tend to see a stability in their mood, a stability in their behavior." However, some victims do not ever get back to the same level of functioning that they had had before the sexual assault. They might fall into a cycle of victimization, or turn to alcohol or drug use, or display other self-harming behaviors.

Rape trauma syndrome can be very similar to posttraumatic stress disorder. But because the trauma that a victim of sexual assault goes through is so intense, it is different from that experienced by the victim of a car accident or similar trauma. Statistics indicate that only one-third of sexual assaults on adults are reported, both because of the shock and denial and because of the shame, discomfort, and embarrassment that is associated with the issue.

**The Defense Case**

Maria Salazar testified that Jane Doe lives in the apartment complex she has managed since 1978. Salazar usually walks the property around 9:00 p.m. each night, but she does not do security checks. She has never seen [petitioner] before. She does not remember seeing a sheriff's car repeatedly coming to the

apartment complex in 1998 or 1999, or ever seeing a sheriff's deputy visiting Jane or knocking on her door.

Hollister Police Captain Carlos Reynoso interviewed Jane at her apartment on September 13, 2007. Captain Reynoso testified that Jane told him that she had had a relationship with [petitioner] for about seven months starting in October 1999. She said that he would come over at night when he was off work or when he was on his way back from working in the south county, but she could not give specific times. She did say that she usually got off work at 11:00 p.m., but sometimes it was at 10:00 p.m.

Deputy Sheriff Tom Keylon testified that when he interviewed Jane Doe, she said that her relationship with [petitioner] started in 2000. The parties stipulated that "[o]n September the 5th, 2007, Jane Doe . . . said to Sergeant Keylon regarding [petitioner], . . . 'You know, he parked the vehicle in my parking space.'"

Gregg Dietz, a private investigator, testified that he was hired by the defense to follow up on Jane Doe's statements, the police reports, and the grand jury testimony. He went to Jane's apartment complex and spoke with the manager. He learned where Jane's parking stall is. He also canvassed the area for other residents who had lived there during the relevant time period.

Sheriff's Sergeant Tony Lamonica testified that he met [petitioner] when he worked for the Hollister Police Department. When he began working for the sheriff's department in January 2007, he worked under [petitioner]. Sometime in 2007, he was assigned to do an internal affairs investigation of [petitioner]. As part of that investigation, he interviewed Lee B. one time. He asked her what she thought of the allegations against [petitioner]. She responded that she had never seen that side of [petitioner]. She said that [petitioner] had never been violent with her and had never forced anything on her.

Deputy Keylon testified that he interviewed Lee B. two times as part of an internal affairs investigation of [petitioner]. During the first interview, Lee did not make any accusations against [petitioner]. During the second interview, which was in September 2008, Lee said that she had lied during the first interview because of her feelings for [petitioner]. After [petitioner] had harassed and threatened her, she wanted to clear her conscience.

Kim DeShong testified that she knows [petitioner] because they used to ride motorcycles together. She knows Lee B. because Lee was her mother-in-law's physical therapist, and they became friendly. Lee told DeShong about an incident involving [petitioner]. DeShong approached Lee because 'she seemed kind of down,' and DeShong asked her what the problem was. DeShong said that she heard that Lee had been raped. Lee responded, "No, I'm just really pissed off. I shouldn't have said it. It was a mistake." DeShong told Lee that she hoped Lee would "fix the problem." Lee responded that she would.

Denise Caprino testified that she has been dating [petitioner] since July 21, 2007. One day, she and [petitioner] were having coffee when Caprino saw Lee B. walk by them. Lee began sending Caprino text and voice messages in late August or early September 2008. Lee also began driving by when Caprino was with [petitioner]. Caprino responded by texting Lee that she was harassing her and that she was going to call the police. Caprino did not call the police. [Petitioner] admitted that he had had a sexual relationship with Lee B., but he denied having had a relationship with anybody else except Kristi.

*People v. Rodrigues*, 2011 WL 1885367, at *2-9. (REL, Exh. 4 at 4-16.)

## STANDARD OF REVIEW

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

To determine whether a state court ruling was "contrary to" or involved an "unreasonable application" of federal law under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the United States Supreme Court which existed at the time the petitioner's state court conviction became final. *Williams (Terry)*, 529 U.S. at 412. A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405-406.

The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. section 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Further, even if a constitutional error is found, habeas relief may only be granted if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 784 (2001) (*quoting Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). Thus, in order to obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "If this standard is difficult to meet, that is because it was meant to be." *Id.*

In applying the above standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). Specifically, when there is no reasoned opinion from the highest state court that considered the petitioner's claims, the court looks to the last reasoned opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Thus, a federal court will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court precedent. *See Ylst*, 501 U.S. at 804-06; *LaJoie v. Thompson*, 217 F.3d 663, 669

n.7 (9th Cir. 2000). The last reasoned decision in this case is the state appellate court's unpublished disposition issued on May 18, 2011. *People v. Rodrigues*, No. H035024, 2011 WL 1885367 (Cal. Ct. App. May 18, 2011) (unpublished opinion) (REL Exh. 4).

## DISCUSSION

### I. FIRST – THIRD CLAIMS: IAC RELATED TO RAPE TRAUMA SYNDROME EXPERT TESTIMONY

With respect to the expert who opined on rape trauma syndrome ("RTS"), petitioner raises three grounds of ineffective assistance of counsel. Ground one of the amended petition is based upon trial counsel's failure to object to the expert testimony itself. Ground two is premised upon the failure to cross-examine the RTS trauma syndrome expert adequately. In ground three, petitioner asserts that trial counsel failed to investigate and present a rebuttal expert regarding RTS. Petitioner raised all three grounds in his first state court habeas petition. The state court of appeal rejected petitioner's claims regarding failure to object to the RTS expert testimony. Grounds two and three were summarily rejected by the denial of the first state habeas petition.

### A. State Court Opinion

In rejecting the claim of ineffective assistance related to the RTS expert testimony itself, the state appellate court stated:

> It is well settled that to establish a claim of ineffective assistance of counsel, [petitioner] must first demonstrate that trial counsel's representation fell below the standard of reasonableness under prevailing professional norms. He must also show that trial counsel's deficient representation subjected him to prejudice, i.e., that there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to him. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome.' (*Strickland*, *supra*, 466 U.S. at p. 694.)
>
> In *People v. Bledsoe* (1984) 36 Cal.3d 236, 246-248 (Bledsoe), the California Supreme Court held that expert testimony regarding rape trauma syndrome is "inadmissible when offered to prove that the complaining witness has in fact been raped." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*), citing *Bledsoe*, at pp. 248-251.) But the court "recognized, as other courts had held [citation], that such testimony is admissible to rehabilitate the complaining witness when the defendant impeaches her credibility by suggesting

that her conduct after the incident—e.g., a delay in reporting—is inconsistent with her testimony that she was raped." (*McAlpin*, at p. 1300; *see also People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1099; *People v. Brown* (2004) 33 Cal.4th 892, 905.) The *Bledsoe* court "reasoned that 'in such a context expert testimony on rape trauma syndrome would play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths'" (*McAlpin*, at p. 1300, quoting *Bledsoe*, at pp. 247-248.)

In this case, none of the victims immediately reported [petitioner's] rapes to authorities, although both Kristi and Lee B. reported the rapes to their friends. Jane Doe admitted [petitioner] into her home after the first rape, and [petitioner] used the opportunity to rape her again. Lee began a consensual sexual relationship with [petitioner] after he raped her. In light of this evidence, the trial court properly permitted Adler to testify regarding rape trauma syndrome to dispel any misconception that a woman normally would immediately report to authorities that a rape had occurred and/or would not agree to see her rapist again and/or would not thereafter enter into a consensual sexual relationship with her rapist. In addition, the court instructed the jury as to the limited use of Adler's testimony. As the court properly admitted Adler's testimony, and gave a proper limiting instruction as to her testimony, [petitioner] has not shown that he was prejudiced by his counsel's failure to object to her testimony.

*People v. Rodrigues*, 2011 WL 1885367 at *15. (REL Exh. 4 at 25-27.)

**B.    Applicable Federal Law**

To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show that: (1) counsel's performance was deficient, and (2) counsel's deficient representation subjected him to prejudice. *Strickland v. Washington*, 466 U.S. 668, 687-688, 695-696 (1984).

On the performance prong, the court considering the habeas petition "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. The Supreme Court has "consistently declined to impose mechanical rules on counsel." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *Harrington*, 562 U.S. 106 ("Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to anyone technique or approach."). Rather, the "Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Flores-Ortega*, 528 U.S. at 479; *Rompilla v. Beard*, 545

United States District Court
Northern District of California

U.S. 374, 381 (2005) ("A standard of reasonableness applied as if one stood in counsel's shoes spawns few hard-edged rules").

On the second prong, petitioner must "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. The court considering a habeas petition based on ineffective assistance need not assess counsel's performance where petitioner cannot show the requisite prejudice. *Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 n. 3 (9th Cir. 1995). If the state court finds no prejudice, habeas relief is warranted only if that determination was objectively unreasonable. *Woodford v. Visciotti*, 537 U.S. 19, 26-27 (2002) (per curiam) (deferring to state court's conclusion that defendant was not prejudiced by counsel's errors).

With respect to review of a state court's *Strickland* decision on a habeas petition, the Supreme Court has held that

> [t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court.

*Harrington*, 562 U.S. at 101. Thus, when section 2254(d) applies, "the question is not whether counsel's actions were reasonable[;] . . . [t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

**C.      Analysis**

Petitioner has failed to demonstrate that the state appellate court's decision was contrary to or an unreasonable application of *Strickland*. The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). A "'doubly' deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254." *Id.* at 190. *Strickland* requires that the state court review a defense counsel's effectiveness with great

United States District Court
Northern District of California

1  deference, which in turn "translates to a narrower range of decisions that are objectively

2  unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing

3  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

4      Here, looking to the prejudice prong first, the state court determined that the prosecution's

5  RTS expert testimony was properly admitted, and that the testimony was coupled with a proper

6  limiting instruction. Based on that determination, the state court found that no prejudice could

7  have resulted from any error by petitioner's counsel. Where a state court has reasonably

8  determined that no prejudice would result from counsel's performance, the habeas court is not

9  required to assess counsel's performance. *Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52

10  F.3d 1465, 1470 n. 3 (9th Cir. 1995); *Woodford*, 537 U.S. at 26-27 (deferring to state court's

11  conclusion that defendant was not prejudiced by counsel's errors).

12      Consistent with *Bledsoe*, the state appeals court determined that the RTS expert offered no

13  opinion as to whether a rape had occurred in this case. *See Bledsoe*, 36 Cal.3d at 247-48, 251

14  (testimony regarding rape trauma syndrome can be used to rebut misconceptions about whether

15  certain behavior is "inconsistent with" a claim of having been raped, but not to prove that a rape

16  occurred). At the close of the testimony, the trial court instructed the jury on the limited use of the

17  RTS expert's testimony only for purposes of "deciding whether or not any of the victims or other

18  witnesses conduct was not inconsistent with the conduct of someone who has been raped, and in

19  evaluating the believability of that testimony."[2] The Court must presume that the jurors followed

20  the instructions given to them by the trial court. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

21  Those instructions specifically stated that the jury could not consider the expert's testimony on

22

23      _____

24      [2] The trial court gave the following instruction, Judicial Council of California Criminal
    Jury Instruction 1192:

25          You have heard testimony from Jen August Adler regarding rape trauma
            syndrome. Her testimony about rape trauma syndrome is not evidence that the

26          defendant committed any of the charged crimes against him. You may consider
            this evidence only in deciding whether or not any of the victims or other witnesses

27          conduct was not inconsistent with the conduct of someone who has been raped,
            and in evaluating the believability of that testimony.

28  (CT 1110.)

16

1    RTS as evidence of petitioner's guilt, only for purposes of evaluating the credibility of the

2    complaining witnesses.

3            Moreover, Petitioner cannot show that trial counsel's decisions: (1) not to challenge the

4    foundation for admissibility of the testimony or otherwise object to the testimony; (2) not to cross-

5    examine the prosecution's RTS expert further; and (3) not to call its own RTS rebuttal expert were

6    objectively unreasonable.  The Amended Petition alleges that trial counsel was ineffective because

7    he did not move to limit the RTS expert's improper testimony, which offered alleged

8    characteristics of rape victims and perpetrators, and thereby unduly bolstered the complaining

9    witnesses' testimony and credibility.[3]  However, *Bledsoe* confirms that RTS testimony may be

10   admissible for limited purposes of providing the jury an understanding of widely held

11   misconceptions about rape and rape victims, *i.e.*, the purposes for which it was admitted here.

12           Petitioner's trial counsel stated under penalty of perjury that he had "read and researched

13   the area of RTS and read up on the subject in preparation for the case."  (Original Federal Habeas

14   Petition, Attachment 2 at Exh. A ["Cantu Declaration"] at ¶ 3.)  Trial counsel also consulted with

15   Dr. Martinelli, who he understood had expertise with respect to RTS, and discussed the issues

16   with him.  (*Id.*)  Defense counsel ultimately determined not to call Dr. Martinelli as a defense

17   expert, since his expert report indicated "that [petitioner] had serious sexual problems and had a

18   pattern of abusing his partners" and that he "would give answers that would damage [petitioner]."

19   (*Id.* at ¶ 4.)  Defense counsel stated that he "did not consult with any other experts" since he

20   believed their conclusions might also be damaging along those same lines, and he "knew that [the

21   _____

22           [3] Petitioner argues that expert testimony on RTS should have been narrowly circumscribed,
     limited to the facts in evidence, and supported by recent, scientifically reliable studies.  Defense
23   counsel did not request a hearing on the foundation and reliability of the proposed testimony and
     he did not object to the testimony about RTS, the characteristics of victims and of rapists, and the
24   effects on victims' behavior, specifically that defense counsel did not object to testimony that:
     rape victims commonly may continue or begin consensual sexual relationships with the
25   perpetrators; may be unaware that they were raped until later; may remember the rape differently
     depending on the stage of RTS they were in at the time; or alternately admit and deny that they
26   were raped.  (Exh. 4 at 20-21; 8 RT 1840-1841, 1849-1853, 1855, 1869.)  Petitioner offers a post-
     conviction expert, Dr. Ermshar, who opines that Adler was not qualified to testify as an expert on
27   RTS and drew unsupported conclusions based upon her anecdotal observations.  (Original Federal
     Habeas Petition, Exh. C at 0091 *et seq.*)
28

prosecution's expert] Ms. Adler would conduct no investigation of this case." (*Id.* at ¶¶ 4, 5.)  He "felt that Adler did not give convincing testimony given her lack of investigation of the case." (*Id.*)  Trial counsel cross-examined Adler about the lack of empirical support for her opinions.  (8 RT 1868.)

Given the circumstances here, petitioner has failed to rebut the presumption that defense counsel's decisions were reasonable.  Petitioner must overcome the presumption that, "under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689.  Decisions at trial concerning the proper scope of cross-examination are entitled to "great deference." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir.2000).  The relevant inquiry is not what defense counsel *could have* done, but rather whether the choices made by defense counsel were reasonable. *See Babbitt v. Calderon,* 151 F.3d 1170, 1173 (9th Cir. 1998).  Trial counsel's decision not to make other objections or challenges to the admissibility of the expert testimony here does not rise to the level of ineffective assistance. *Cf. Wildman v. Johnson*, 261 F.3d 832, 838 (9th Cir. 2001) (trial counsel acted reasonably by retaining expert to investigate the crime scene and "trial counsel could reasonably rely on this initial expert investigation [where petitioner] did not show that the expert retained revealed that further investigation would be productive.").

## II.    FOURTH CLAIM: IAC BASED UPON FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY ON WITNESS RELIABILITY

In ground four, petitioner contends he received ineffective assistance of trial counsel for counsel's failure to present expert evidence of factors affecting the reliability of a victim's testimony in a sexual assault case, such as an expert in "memory and suggestibility." (Original Federal Habeas Petition, Attachment 2 at 58-61.)  The state intermediate and high courts denied the state habeas petition, rejecting the ineffective assistance claim on these grounds without comment.  Where the claim is summarily denied without a reasoned opinion, the federal habeas court must conduct a de novo review of the record to determine "whether the denial was contrary to or an unreasonable application of federal law." *Greene v. Lambert*, 288 F.3d 1081, 1088-89 (9th Cir. 2002.)  As stated above, to establish a claim of ineffective assistance of counsel, petitioner must show that his counsel's performance was deficient and subjected him to prejudice.

*Strickland*, 466 U.S. at 687-688, 695-696. On review under section 2254(d) applies, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

Here, trial counsel states that he retained Dr. Martinelli for, among other reasons, the purpose of "assess[ing] the credibility of statements made by the various [complaining witnesses] to the law enforcement officers who interviewed them." (Decl. Cantu ¶ 3.) Trial counsel determined not to call Dr. Martinelli out of concern that cross-examination might elicit damaging testimony about "the graphic details of the sexual conduct and practices of [petitioner]." (*Id*. at ¶ 4.) Trial counsel was concerned that cross-examination would disclose that "Dr. Martinelli opined that [petitioner] has serious sexual problems and had a pattern of abusing his partners." (*Id*.) Trial counsel further stated that he reviewed Dr. Martinelli's opinion regarding police practices in interviewing complaining witnesses were biased and inconsistent, but decided not to use Dr. Martinelli or "retain a memory/suggestibility expert to establish how this aspect of the investigation resulted in unreliable testimony by the various alleged victims." (*Id*. at ¶ 6.)

Petitioner argues that lay jurors would have difficulty evaluating the credibility of these witnesses without expert testimony to explain why suggestive interviewing techniques and other factors might result in complaining witnesses falsely reporting or remembering consensual sex as rape. (Traverse at 40:4-6, 9-10.) The complaining witnesses testified that Rodrigues sexually assaulted them, *i.e.* engaged in non-consensual sexual relations. Those same complaining witnesses began or continued consensual sexual relationships with Rodrigues after the sexual assaults. Petitioner offers the declaration of Dr. Deborah Davis, who would testify that the complaining witnesses "knew Rodrigues and had problematic relationships with him[, which] may have affected their perceptions and memories" that they did not consent and that they communicated to Rodrigues that they did not consent. (Exh. 12, Davis Decl. at 432-436.) Petitioner contends that "[l]ay jurors would be unlikely to understand this dynamic without expert testimony." (Traverse at 39:27-28.)

The prosecution's expert was permitted to testify to counter "widely held misconceptions

about rape and rape victims." *Bledsoe* at 36 Cal.3d at 247-48. Petitioner suggests that his counsel's failure to call an expert to "counter the counter"— that is, to testify why a complaining witness's testimony might be a false report or false memory—fell below the *Strickland* standard. Petitioner's argument is little more than a repetition of his claim that his counsel should have called an expert to counter the prosecution's expert on Rape Trauma Syndrome. As addressed above, the Court does not find that the state court was unreasonable in its determination that defense counsel's decision not to call an additional RTS expert did not fall below the *Strickland* standard.

Moreover, petitioner has not established a reasonable likelihood that the result would have been different had his counsel offered an expert on memory and suggestibility. Expert testimony, under California law, must be "related to a subject that is sufficiently beyond common experience" that the expert would assist the jury in making its determination. Cal. Evidence Code § 801. Petitioner fails to show that expert testimony related to assessing the credibility of the complaining witnesses' testimony would have been admissible, much less that its admission would have created a reasonable doubt respecting petitioner's guilt, considered in connection with the totality of the evidence before the jury. *Strickland*, 466 U.S. at 695; *Woods v. Sinclair*, 764 F.3d 1109, 1142 (9th Cir. 2014) (no ineffective assistance for failure to call expert regarding witness memory where testimony would have been cumulative of cross-examination of witnesses).

In connection with his habeas petition, petitioner offered post-conviction expert declarations: one on memory and suggestibility, and one on whether the *Strickland* is met by trial counsel's failure to call such an expert. However, these declarations do not persuade the court that an expert on memory and suggestibility of eyewitnesses would have materially assisted the jury more than the traditional methods of challenging eyewitness identification through cross-examination. *See United States v. Hicks,* 103 F.3d 837, 847 (9th Cir.1996) (*overruled on other grounds; United States v. Rincon,* 28 F.3d 921, 923 (9th Cir.1994); *cf. Gonzalez v. Wong*, 667 F.3d 965, 983–84 (9th Cir. 2011) (reasonable to conclude that evidence of "mental condition that made [witness] prone to lying" and suggesting incompetence to testify could have affected the jury's

evaluation of his credibility). The declarations do not persuade the Court that such expert testimony was likely to be helpful or necessary to assist the jury in this case. The fact that petitioner engaged in sexual contact with the complaining witnesses was not in dispute. The complaining witnesses were adults, were subject to extensive cross-examination, and were not identified as having mental or behavioral characteristics that required expert testimony to evaluate whether they were motivated or influenced to lie about being assaulted. While in some cases "[i]t can be assumed that . . . counsel would be deemed ineffective for failing to consult or rely on experts," state courts have wide latitude in determining whether defense counsel's strategic decision to forego an expert constituted ineffective assistance. *Harrington*, 562 U.S. at 106–07 (2011) (holding that defense attorney's failure to consult blood evidence expert did not establish ineffective assistance).

The state court's denial of habeas relief on these grounds was neither an unreasonable application of *Strickland* nor an unreasonable determination of the facts. Accordingly, habeas relief on the fourth claim is denied.

### III. FIFTH CLAIM: IAC BASED UPON FAILURE TO IMPEACH DOE 1'S CREDIBILITY ADEQUATELY

In his fifth claim, petitioner contends that he was deprived of the effective assistance of counsel due to trial counsel's mishandling of the impeachment of Jane Doe 1. Petitioner alleges that Doe 1 told police she had gotten pregnant by petitioner and had a miscarriage. Trial counsel had evidence to the contrary. The evidence was excluded. Petitioner alleges that his trial counsel was ineffective because he should have cross-examined Doe 1 about the statement to show bias and a motive to fabricate her testimony, rather than attempt to prove a negative, *i.e.* that Doe 1 was not pregnant by petitioner. (Dkt. No. 22, Amended Federal Habeas Petition, at ECF page 23.)

Petitioner raised this claim on direct appeal, which the appellate court rejected, and in his first petition for writ of habeas corpus which was summarily denied.

#### A. State Court Decision

The state appellate court rejected petitioner's claim as follows:

Defense counsel wanted to recall Jane Doe in order to question her about

an out-of-court statement she had made that she had become pregnant, because "we believe that statement has all the earmarks of not being credible." The court asked whether [petitioner] had any evidence that the statement was "not accurate." Defense counsel replied that neither Deputy Keylon nor anybody else had investigated the statement "to find out if it's true," and that fact was "evidence that [it] was not a true statement." The court noted that Jane Doe "testified as to two instances of rape, and she testified to many other instances of consensual sex," and that "sometimes females that engage in sex that tell a lie get pregnant." But, because [petitioner] had "no evidence, no indices of any kind that it's not true," "I'm excluding it under [Evidence Code section] 352."

Petitioner now contends that his counsel rendered ineffective assistance "as to this line of impeachment. Rather than try to prove something he could not prove, he could and should have offered the evidence as to the pregnancy and miscarriage for bias and motive, a perfectly permissible avenue of admissibility. Further, he should have questioned the witness about it on cross-examination before she was excused." Jane Doe's "pregnancy by [petitioner] and her subsequently suffering a miscarriage would clearly give her a reason to have animosity toward him and thus a reason to lie, particularly in light of the fact that she wanted more out of the relationship tha[n] he did. Such evidence was thus relevant and admissible on that basis." "Trial counsel's failure to take the appropriate steps that would have allowed him to fully impeach [Jane Doe] with what information he had available and to offer such impeachment on a basis that had viable admissibility compels reversal pursuant to the *Strickland* standard."
. . . .

Unless prohibited by statute, the jury, in determining the credibility of a witness, may consider "any matter that has any tendency in reason to prove or disprove the truthfulness of [the witness's] testimony at the hearing," including the extent of the witness's capacity to perceive, recollect, or communicate any matter about which the witness testifies, and the existence or nonexistence of a bias, interest, or other motive. (Evid.Code, § 780.) Even if evidence is relevant, the court has the discretion to exclude it if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid.Code, § 352.)

In this case, as the trial court found, Jane Doe testified that she and [petitioner] had consensual sex on a number of occasions, and that [petitioner] had raped her on two occasions after she told him that she wanted to end their relationship. The probative value of testimony regarding Jane Doe's possible pregnancy and miscarriage would have been slight given her admitted consensual sexual relationship with [petitioner]. [Petitioner] does not contend that Jane Doe claimed that she became pregnant as a result of [petitioner's] unlawful, as opposed to lawful, conduct. And any bias or hostility she harbored against defendant could have been due to the conduct that she testified to even if she did not become pregnant. As the probative value of any testimony regarding the possible pregnancy and miscarriage would have been slight, we cannot say that

the trial court erred or abused its discretion in excluding it under Evidence Code section 352.  In addition, we cannot say that counsel rendered ineffective assistance by failing to offer the evidence "for bias and motive," as [petitioner] now claims.

Even if we were to find that counsel's impeachment of Jane Doe was deficient, we would find that [petitioner] is unable to show that he was prejudiced thereby.  The court had denied counsel's request for release of Jane Doe's medical records and counsel had no evidence that Jane Doe's alleged claim of a pregnancy and miscarriage were not true.  Accordingly, we find that it is not reasonably probable that a more favorable outcome would have occurred had counsel offered the evidence "for bias and motive," as [petitioner] now claims.

*People v. Rodrigues*, 2011 WL 1885367 at *18-19. (REL Exh. 4 at 31-32.)

### B.      Applicable Federal Law

As stated above, a court considering a habeas petition "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689.  Generally, "suggestions regarding how defense counsel might have handled [petitioner's] cross-examination differently are insufficient to support an ineffective assistance of counsel claim." *Mancuso v. Olivarez*, 292 F.3d 939, 955 (9th Cir. 2002) (concluding counsel's failure to impeach witness for bias did not constitute a deficient performance), *overruled on other grounds in Slack v. McDaniel*, 529 U.S. 473 (2000).  The habeas court "will not second-guess such decisions or use hindsight to reconstruct the circumstances of counsel's challenged conduct." *Id.* at 954, citing *Strickland,* 466 U.S. at 688.

### C.      Analysis

Petitioner fails to establish that the state court of appeal applied *Strickland* incorrectly with respect to trial counsel's election not to cross-examine Jane Doe 1 on the subject of a possible pregnancy and miscarriage.  The state appeals court held that the probative value of any testimony concerning possible pregnancy and miscarriage was questionable, given that Jane Doe 1 had testified already to consensual sexual acts with petitioner over the course of a months-long relationship.  Evidence of her pregnancy would not have had any bearing on questions of her consent or petitioner's guilt.

United States District Court
Northern District of California

Jane Doe 1 testified that she had ended her relationship with petitioner, yet he continued to call her repeatedly, come to her home, pound on the door and yell through the mail slot until she let him in, even though she did not want to do so. (RT 1597-99, 1603, 1624.) He would come to her home in his sheriff's uniform and his patrol car. (RT 1624.) She testified that, on two occasions, she did not want to have sex with petitioner, and told him no, but he overpowered her and raped her in her home. (RT 1603-1604, 1606.) She also testified that she tried to break off the relationship with him because it was not going anywhere, that her boss told her petitioner was never going to marry her, and eventually she found out he was married because petitioner's wife called her. (RT 1605, 1607-08.) Petitioner offers no cogent explanation of why evidence of a pregnancy would have indicated bias or a motive to fabricate distinct from any bias or hostility attributable to the other conduct to which Jane Doe 1 testified. As the state court determined, "any bias or hostility she harbored against defendant could have been due to the [other] conduct that she testified to," regardless of whether she became pregnant by sexual contact with petitioner. *People v. Rodrigues*, 2011 WL 1885367 at *19. (REL Exh. 4 at 32.)

Further, the state court's rejection of a *Strickland* challenge for failure to cross examine Doe 1 on a possible pregnancy and miscarriage is not an unreasonable application of the *Strickland* standard. Declining to cross-examine Doe 1 on these topics appears to be a reasonable strategic decision in the context of her testimony. First, the trial court had already excluded other evidence proffered by defense counsel regarding Jane Doe 1's pregnancy as irrelevant. (CT 828, RT 1591-92, 1622, 2149-51.) Second, Jane Doe 1's testimony had already indicated she was a fragile and sympathetic witness. She testified that the two alleged rapes occurred while she was diagnosed with and in treatment for breast cancer. (RT 1614, 1616-17.) She testified that she was still undergoing radiation treatment at the time of the trial. (RT 1601-03.) She needed to take breaks during direct cross examination, apparently because she became emotional during her testimony. (RT 1600, 1614.) Trial counsel took the opportunity to cross-examine Jane Doe 1 on a variety of subjects. His failure to pursue an apparently tangential and weak avenue of cross-examination would not support insufficient performance under *Strickland*, much less suggest any

prejudice, in fact, it could have done much more harm than good from a trial strategy perspective.

Accordingly, habeas relief on the fifth claim is denied.

## IV.    DECLARATION OF DOE 2 (KRISTI R.)

SIXTH CLAIM: EXCLUSION OF KRISTI R.'S DECLARATION IMPEACHING HER TRIAL
TESTIMONY IN VIOLATION OF CONFRONTATION AND DUE PROCESS RIGHTS

SEVENTH CLAIM: IAC FOR TO FAILURE TO IMPEACH KRISTI R. WITH HER DECLARATION

In ground six, petitioner contends the trial court erred by excluding the declaration made by petitioner's ex-wife Kristi (complaining witness Doe 2) that would have impeached her trial testimony, her other statements to the police, and her credibility.  Specifically, petitioner contends the trial court erred because, in portions of the declaration, Kristi stated that the sexual contact charged as rape against petitioner was consensual, that she was never afraid of him, that she did not need a restraining order, and that she only obtained a restraining order because San Benito County Sheriff's deputies pressured her to do so.  (CT 1188-90 [Kristi Declaration].)  The trial court acknowledged that those portions concerning Kristi's consent and whether she was afraid of petitioner were relevant.  (RT 1579-82.)  However, defense counsel's request to have the entire declaration entered into evidence was denied because the trial court found that the remainder of the declaration contained irrelevant and inadmissible statements about pressure from the sheriff's deputies.  (RT 1579-1583.)  Petitioner contends that the entire declaration was relevant information favorable to his defense and erroneously excluded from the jury's consideration. (Amended Petition at ECF page 23-24.)

In ground seven, a related claim, petitioner contends he received ineffective assistance due to defense counsel's failure to seek admission of those portions of the declaration the trial court determined were relevant to impeach Kristi's trial testimony, and failure to cross-examine her about the exculpatory statements.  (Amended Petition at ECF page 24.)

As petitioner raised the claims on direct appeal, as well as in his first petition for writ of habeas corpus, the Court reviews those decisions as a threshold matter.

**A.      State Court Decision**

The state court of appeal rejected the above-referenced claims as follows:

Kristi testified that she talked to defense investigators in September 2008. She answered their questions and they typed up a statement for her to sign. She read it and signed it.  Defendant[4] sought admission into evidence of the contents of Kristi's signed statement, arguing that it contained a statement that she "never witnessed any behavior that made her feel fearful of him, which is a prior inconsistent statement we believe in some capacity with her testimony." It also contained a statement "that she felt that she was manipulated by the [s]heriff's [d]epartment and considered vulnerable, she was going through a separation and difficult divorce proceedings." Counsel asked that "the entire declaration be submitted, your Honor, without redaction."

The court ruled as follows. "In reviewing that document, the unmarked portion on the first page is the only relevant part.  It's one sentence which she testified to on examination and/or cross-examination that she did say she signed the document that said she had never been afraid of [defendant]. [¶] And on page two, the only possible relevant stuff—calling it as nice a word as I can—is her—is the one sentence, and I will read it under quotes, because it doesn't necessarily make a complete sentence, quote, 'As I look back now with a clear mind, I can honestly say that the night in question when the sheriff deputies alleged spousal rape was actually consensual.' I'm not sure that's a complete sentence. I think there are words missing that make it context [*sic*]. [¶] And on the third page there is nothing relevant to this case that's admissible other than the declaration under penalty of perjury, and not all of the prior statement is admissible just to get in some inconsistent parts.  And the remainder of this declaration I find is filled with inadmissible, irrelevant, unproven allegations against numerous other persons and groups of persons and its admission would greatly confuse the jury and mislead the jury as to the issues in this case and admit inadmissible conjecture, speculation, and argument inputted by whoever was the drafter of the document. So [the document] is not received."

Defendant brought up the declaration again during the parties' discussion with the court about the jury instructions.  Defense counsel argued: "[T]o disallow that declaration from being shown to the jury with respect to contradictory evidence that she signed with specific language addressing her reasoning behind the first accusation is fundamentally unfair to the defense, your Honor.  And it's not hearsay because it's not offered for the truth of the matter. [¶] Those statements whether or not they are true is not the reason.  It shows her state of mind.  Whether or not the sheriffs actually pressured her, that's not—whether they actually did it is not the reason."  The prosecutor argued that the evidence showed that Kristi talked to the defense investigators after she lost custody of her

---

[4] For clarity, the Court retains the reference to petitioner as "defendant" in this portion of the appellate court's decision.

children and she told defendant that she would do anything to get them back, and that shortly after she signed the declaration she got her children back. "The content of the declaration is [¶] ... [¶]—you know, irrelevant." The court declined to change its ruling on the admission of the declaration.

> . . .

> Defendant requested that the court admit Kristi's "entire declaration. . . without redaction." The court denied the request, finding that only two sentences in the declaration were possibly relevant. We review the trial court's decision to admit or exclude evidence for abuse of discretion. (*People v. Vieira* (2005) 35 Cal.4th 264, 292; *People v. Parrish* (2007) 152 Cal.App.4th 263, 274.) As defendant now concedes that only two portions of Kristi's declaration were possibly relevant and admissible, he has waived any claim that the court erred in failing to admit the entire declaration.[5]

> In addition, defendant has failed to show that he was prejudiced by counsel's failure to request that only the two possibly relevant portions of the declaration be shown to the jury. Kristi testified regarding the context in which the declaration was prepared and signed. She was also examined and cross-examined regarding the contents of the declaration, and she testified that the declaration was "true and honest." The declaration itself was hearsay, i.e., "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid.Code, § 1200, subd. (a).) Defense counsel argued that the declaration was not hearsay, because it was not offered for its truth but to show Kristi's state of mind. (Evid.Code, § 1250, subd. (a).) However, the statements in Kristi's declaration that sheriff's deputies "swayed" her into obtaining a restraining order and that her allegations against defendant were due to the deputies' "aggressive pursuit," which are the two portions of the declaration that defendant argues here should have been admitted, are allegations as to the deputies' conduct that were offered for the truth of the matter asserted and not to prove Kristi's state of mind. In addition, the trial court could properly find that the allegations could confuse or mislead the jury regarding the proper issues before it. As Kristi testified generally as to the existence and relevant contents of her declaration, and defendant has not shown that counsel failed to get any specific portion of the declaration admitted into evidence that could have been properly admitted, he has not shown that he was prejudiced by counsel's actions.

*People v. Rodrigues*, 2011 WL 1885367 at *19-21 (alterations in original). (REL Exh. 4 at 33-36.)

## B.    Applicable Federal Law

Federal habeas review does not lie to review a state court's evidentiary ruling, unless it was so prejudicial as to constitute a violation of due process. *Estelle v. McGuire*, 502 U.S. 62, 67

---

[5] Because petitioner raised the issue of failure to admit the declaration in its entirety in his habeas petition, and respondent here does not raise waiver, the Court considers the issue without concern for any waiver.

United States District Court
Northern District of California

(1991).  Where the trial court excluded evidence, a due process violation arises only where the evidence excluded had "persuasive assurances of trustworthiness" and was "critical" to the defense.  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).  "[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 326-327 (2006) (citations omitted).

Further, habeas relief is not available if the court does not find prejudice, *i.e.*, that the exclusion or admission of evidence had a substantial or injurious effect or influence on the jury's verdict.  *Brecht v. Abrahamson,* 507 U.S. 619 (1993); *McGuire*, 502 U.S. at 67 (petitioner must show admission of evidence was so prejudicial that it rendered the trial fundamentally unfair).

**C.     Analysis**

Petitioner claims both that the trial court erred in excluding the Kristi declaration from evidence, and that defense counsel rendered ineffective assistance on account of his failure impeach Kristi with statements in the declaration.  The Court considers each claim in turn.

### *1.     Due Process Violation*

Petitioner contends that the trial court's restriction of his right to cross-examine Kristi with statements in the declaration rises to the level of a constitutional violation, because a reasonable juror might have received a significantly different impression of Kristi's credibility absent the restriction.  Petitioner's argument rests on the contention that exclusion of the declaration violated his rights under the Confrontation Clause by limiting his cross-examination of Kristi.  Petitioner's argument is both factually and legally unsound.

First, petitioner misinterprets the case law in this area.  A court violates the Confrontation Clause only when it prevents a defendant from examining on a particular and relevant topic. *Fenenbock v. Director of Corrections*, 692 F.3d 910, 919 (9th Cir. 2012).  The Supreme "Court has never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes."  *Nevada v. Jackson*, 569 U.S. 505, 511 (2013) (emphasis in original) (reversing Ninth Circuit for "elid[ing] the distinction between cross-examination and

extrinsic evidence by characterizing the cases as recognizing a broad right to present 'evidence bearing on [a witness'] credibility'"). Petitioner was not limited in his cross-examination of Kristi, but only denied the admission of the entirety of a declaration based upon the trial court's determination that portions of it were irrelevant, confusing, and misleading. (RT 1583.)[6]

Moreover, and applying the standard applicable to habeas review of the trial court's decision to exclude evidence, petitioner has not shown that the entirety of the declaration had "persuasive assurances of trustworthiness" and was "critical" to the defense, such that its exclusion would violate his due process rights. *Chambers*, 410 U.S. at 302. Kristi's declaration, obtained by defense investigators in September of 2008, stated that she had "never been afraid of [petitioner] and have never been a witness to any behavior that made me fearful of him." (CT 1188.) Kristi stated in the declaration that sheriff deputies spoke to her during the time she was separated from petitioner and "swayed me to obtain a restraining order." (*Id.*) Kristi further stated in the declaration that "the night in question when the sheriff deputies alleged spousal rape [*sic*] was actually consensual." (CT 1189.)

First, the declaration was lacking in persuasive assurances of trustworthiness. The trial court declined to admit the declaration, drafted by defense investigators for Kristi's signature, because it included argumentative statements about irrelevant matters. The trial court ruled that only portions of the declaration would be relevant to show that Kristi had made prior inconsistent statements, either about whether she was afraid of petitioner, or whether the alleged incident was consensual. (RT 1580-83.) The trial court found the remaining portions of the declaration were "inadmissible, irrelevant, unproven allegations against numerous other persons and groups of persons and [their] admission would greatly confuse the jury and mislead the jury as to the issues in this case and admit inadmissible conjecture, speculation, and argument." (RT 1583.) As the appellate court noted, statements therein about the sheriff's deputies trying to sway Kristi to get a

---

[6] Further, the appellate court held that since petitioner "concede[d] that only two portions of Kristi's declaration were possibly relevant and admissible, he has waived any claim that the court erred in failing to admit the entire declaration." *People v. Rodrigues*, 2011 WL 1885367 at *20. (REL Exh. 4 at 35.)

United States District Court
Northern District of California

restraining order, or seeking information to substantiate termination proceedings against petitioner, were hearsay statements offered for their truth, not for Kristi's state of mind. *People v. Rodrigues*, 2011 WL 1885367 at *21. (REL Exh. 4 at 36.) Defense counsel refused to budge on his position that the entire declaration should be admitted, and the trial court overruled his argument. (RT 1581-82.)

Second, admission of the declaration was not critical to petitioner's defense. It was, at most, potential impeachment of the credibility of a complaining witness's testimony. However, as the appellate court determined, Kristi had, in fact, "testified generally as to the existence and relevant contents of her declaration." *People v. Rodrigues*, 2011 WL 1885367 at *21. (REL Exh. 4 at 36.) Kristi was examined on the subjects in the declaration, including the contradiction between it and her trial testimony. The trial court overruled defense counsel's argument that the declaration was needed to show that Kristi had felt pressured by sheriff's deputies, since the issue was already covered in her trial testimony. (RT 1580-83.) Using the declaration to refresh Kristi's recollection, defense counsel had asked Kristi if she was honest with the defense investigators when they spoke to her. Kristi testified that she was honest about the sheriffs' investigation, and that she felt the sheriffs' deputies were pressuring her. (RT 1330-31.) Defense counsel also cross-examined Kristi about whether her statements to the deputies were made when she was in the midst of her divorce from petitioner, and whether the judge in that case was aware of her allegations. (RT 1335-36.) On re-examination, the prosecutor also used the declaration to refresh Kristi's recollection, asking her if she had said in the declaration that she was "never afraid" of petitioner, contrary to her trial testimony that she *was* afraid on the night of the incident to which she testified. (RT 1338-40.) Confronted with the contradiction, Kristi replied that she was "just trying to get my children back and have him stop" and that she "never lied" to the sheriff's deputies, to the police, or during her trial testimony. (RT 1339, 1341.) Further, Kristi testified at trial that she did not report the incident initially and did not feel it was rape since it was her husband, but eventually talked to the sheriff's deputies about it. (RT 1315-16.)

Thus, the contradictory statements and the possible motive to accuse petitioner were raised

both in Kristi's examination and cross-examination. Sufficient information exists in the record for the jury to appraise Kristi's credibility, and reach the conclusion that she had been raped. (RT 1310-1314.) Sufficient information also exists to permit the jury to conclude that inconsistent statements in her declaration were the result of pressure by petitioner to recant her prior report of rape in order to regain equal custody of her children in the pending divorce proceedings with petitioner (RT 1316, 1319-20, 1322-28), rather than pressure by the Sheriff's Department to support their termination case against petitioner.

Having failed to establish that the state courts unreasonably applied federal law concerning the exclusion of this evidence and its effect on his defense, petitioner's habeas claim fails on these grounds.

### 2. Ineffective Assistance of Counsel

The Court next turns to petitioner's claim that his defense counsel's failure to seek admission of those portions the trial court expressly found relevant constituted ineffective assistance. Defense counsel inquired whether Kristi remembered denying having been raped when the Sheriff's deputies asked her about it, to which she replied, "I don't recall that. If you have it written down, I can read it. I don't recall at the moment." (RT 1331.) Petitioner argues that it was ineffective assistance to fail to seek admission of the relevant portions of her declaration at that point, or at least to have cross-examined her about the specific statements in her declaration that contradicted on her testimony and would have impeached her credibility.

As stated in connection with the sixth claim for violation of due process, Kristi was examined and cross-examined on the relevant impeachment issues in her declaration. Defense counsel asked Kristi if she was honest with the defense investigators when they spoke to her, and she said she was honest with them about the sheriffs and the investigation they did, testifying that she felt they were pressuring her. (RT 1330-31.) The prosecutor later used the declaration to refresh Kristi's recollection on redirect, asking Kristi if she had stated in the declaration that she was "never afraid" of petitioner, in contradiction to her earlier trial testimony about being frightened and in shock on the night of the incident. (RT 1339.) Confronted with the

contradiction, Kristi replied that "it was confusing" and she was "just trying to get my children back and have him stop." (RT 1339.) Kristi stated that her earlier testimony about being frightened was true, and that she "never lied" to the sheriff's deputies, to the police, or during her trial testimony. (RT 1339, 1341.)

Again, under AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable" not "whether defense counsel's performance fell below *Strickland's* standard." *Harrington*, 562 U.S. at 101. This Court's review is "doubly deferential." *Pinholster*, 563 U.S. at 189. Kristi testified to the contradictions between the declaration and her trial testimony. She testified that she felt pressure from the Sheriff's deputies, and that she did not think it was rape though her friend told her she should report it as rape. She also tacitly acknowledged that her declaration conflicted with her trial testimony when questioned by the prosecutor on redirect, after defense counsel had marked the declaration as an exhibit Kristi could authenticate. That defense counsel decided not to seek admission of just the limited portions of the declaration the trial court found relevant certainly could have been a strategic decision, since Kristi had already testified regarding those issues and the prosecutor had already "drawn the sting" of the contradiction on redirect using the declaration. Here, the Court cannot say that counsel's performance fell below the *Strickland* standard, much less that the state court's silence regarding his performance (*i.e.,* failure to find deficient performance) was unreasonable.

Moreover, no habeas relief is warranted in the absence of a substantial likelihood of a different result. *Harrington*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable."). The state appeals court found that petitioner had failed to show he was prejudiced by counsel's failure to seek admission of the portions of the declaration or to cross-examine her using the declaration. The portions relevant to her credibility were the subject of examination and cross-examination, and the trial court was well within its discretion to exclude portions that were purely hearsay statements with no applicable exception.

Accordingly, habeas relief on the sixth and seventh claims is denied.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**V.    EIGHTH CLAIM: ERRONEOUS ADMISSION OF EVIDENCE OF PRIOR SEX OFFENSES TO PROVE CRIMINAL DISPOSITION IN VIOLATION OF DUE PROCESS RIGHTS**

In his eighth ground for relief, petitioner contends that the admission of testimony about prior sexual assaults to prove propensity violated his due process rights. Petitioner raised this claim on direct appeal and the appellate court rejected the claim.

**A.    State Court Opinion**

The Court of Appeal determined that the trial court did not abuse its discretion by admitting the testimony about defendant's prior sexual conduct, and determined that it was properly admitted, stating as follows:

Prior to trial, defendant moved to exclude all Evidence Code section 1108 evidence. After holding an Evidence Code section 402 hearing, at which John Klauer and Misty R. gave testimony similar to their trial testimony, the court stated that it would "take the motion under submission and ... allow re-argument after [the alleged victims] have testified." After hearing the victims' trial testimony, the court excluded the proffered Evidence Code section 1108 testimony of three witnesses but admitted the testimony of John Klauer and Misty R. "In regards to John Klauer, I have weighed its probative value. Its probative value I think is significant and it is not outweighed by any undue consumption of time or misleading the jury or causing any undue prejudice, and I would allow you to call John Klauer. [¶] With respect to Misty [R.], I believe her testimony is highly probative. The probative value is not outweighed by any undue consumption of time or confusing the issues or misleading the jury or creating undue prejudice, so I will allow you to present that witness also."

Defendant now contends that the trial court erred in admitting John Klauer's and Misty R.'s testimony. "First, Evidence Code section 1108 violates the due process clause of the United States Constitution; second, [defendant's] Evidence Code [section] 352 objection was meritorious; and third, admission of the prior sex acts was not permissible per Evidence Code sections 1108 or 1101."

The Attorney General contends that "the evidence was particularly probative because the testimony was that the victim in Laughlin and Misty R. were sexually assaulted by [defendant] in the same way he assaulted Jane Doe [, Kristi, and Lee B.] in the present matter and in each case the acts were without consent. The trial court properly admitted this testimony as evidence of [defendant's] propensity to commit sexual offenses. Moreover, the trial court considered whether the concerns underlying Evidence Code section 352 warranted exclusion of the evidence, and reasonably concluded they did not."

Evidence Code section 1108, subdivision (a), states: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by

Section 1101, if the evidence is not inadmissible pursuant to Section 352." Evidence Code section 1101, subdivision (a), states in pertinent part: "Except as provided in this section and in Section [ ] ... 1108, ... evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." "Nothing in this section prohibits the admission of evidence that a person committed a crime ... when relevant to prove some fact (such as ... intent, ... identity, ... ) other than his or her disposition to commit such an act." (Evid.Code, § 1101, subd. (b).)

Defendant acknowledges that our Supreme Court has rejected a due process challenge to Evidence Code section 1108. "[W]e think the trial court's discretion to exclude propensity evidence under [Evidence Code] section 352 saves [Evidence Code] section 1108 from defendant's due process challenge." (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).) Defendant also acknowledges that this court is bound by that ruling. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) He states that he is presenting his due process challenge in order to "preserve his ability to take his challenge to a higher court if need be." Therefore, we will not further address this contention.

Evidence Code section 352 provides that a court has discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." However, "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '... The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

The trial court has broad discretion to exclude evidence of prior sex offenses under Evidence Code section 1108 where the probative value of the evidence is outweighed by its prejudicial effect. (*Falsetta, supra,* 21 Cal.4th at p. 919.) Accordingly, the standard of review for an order admitting evidence of prior sex offenses is abuse of discretion. (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314–1315.) "A prior court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in any arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

Relying on *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris* ), defendant points to three factors which he contends weighed in favor of exclusion of John Klauer's and Misty R.'s testimony. In *Harris,* the appellate court enumerated five factors that should be considered in reviewing proffered Evidence Code section 1108 testimony under an Evidence Code section 352

analysis. These factors are the inflammatory nature of the evidence, the probability of confusion, the remoteness or staleness of the prior conduct, the consumption of time, and the probative value of the evidence. (*Harris, supra,* at pp. 737–739.) Defendant argues that "the inflammatory nature of the prior conduct, its dissimilarities, its remoteness, plus the fact that there was no conviction as to said conduct" leads to "the conclusion that the trial court abused its discretion in determining that its probative value outweighed its prejudicial effect."

The Attorney General contends that the admission of John Klauer's and Misty R.'s testimony was proper under Evidence Code section 1108 and that it was not more prejudicial than probative.

"In *People v. Ewoldt* (1994) 7 Cal.4th 380 [ (*Ewoldt* ) ], the California Supreme Court (at p. 405) deemed it important in evaluating prior uncharged acts pursuant to section 352, whether '[t]he testimony describing defendant's uncharged acts ... was no stronger and no more inflammatory than the testimony concerning the charged offense.'" (*Harris, supra,* 60 Cal.App.4th at pp. 737–738.) We find that the testimony describing defendant's uncharged offenses was no stronger and no more inflammatory than the testimony by the victims of defendant's charged offenses. The uncharged offenses constituted forcible rape or attempted rape as did the charged offenses. Misty R. was a minor at the time of the offenses against her, but this alone does not make it more inflammatory than the forcible rapes of Jane Doe, Kristi, and Lee B.

There may be a probability of confusion when the uncharged acts did not result in criminal convictions, because there is an increase in the danger that the jury might be inclined to punish defendant for the uncharged offenses. (*Harris, supra,* 60 Cal.App.4th at pp. 727–728; *Ewoldt, supra,* 7 Cal.4th at p. 405.) In this case, John Klauer testified that the victim did not report the Laughlin incident to the police, and Misty R. testified that she did not report the incidents involving her to the police until a few years after the incidents. The court instructed the jury both before John Klauer's and Misty R.'s testimony, and again after the close of all the evidence, that the incidents John Klauer and Misty R. testified to were not part of any count filed against defendant, that it could consider this evidence only if the People had proved beyond a reasonable doubt that defendant had in fact committed those uncharged offenses, and that, even if it found beyond a reasonable doubt that defendant had committed an uncharged offense, that factor was not sufficient by itself to prove that defendant was guilty of committing the charged offenses. (See CALCRIM No. 1191.)[7] Thus, we find that there was little

---

[7] In the Sixth District Court of Appeal's decision, it noted that:

The court instructed the jury: "The People presented evidence that the defendant committed the forcible rape, an attempted forcible rape, and an unlawful sexual intercourse with a minor who was more than three years younger than the defendant that are not part of any count filed against the defendant. [¶] The

probability of confusing the jury regarding the evidence of the uncharged offenses.

"'Remoteness" or 'staleness' of prior conduct is an appropriate factor to consider in a section 352 analysis. [Citation.]" (*Harris, supra,* 60 Cal.App.4th at p. 739.) "Remoteness of prior offenses relates to 'the question of predisposition to commit the charged sexual offense.' [Citation.] In theory, a substantial gap between the prior offenses and the charged offenses means that it is less likely that the defendant had the propensity to commit the charged offense. However, ... significant similarities between the prior and the charged offenses may 'balance[ ] out the remoteness.' [Citation.] Put differently, if the prior offenses are very similar in nature to the charged offenses, the prior offenses have greater probative value in proving propensity to commit the charged offenses." (*People v. Branch* (2001) 91 Cal.App.4th 274, 285 (*Branch* ).) In *Branch,* the appellate court found that a 30–year gap between the prior offenses and the charged offenses was balanced out by the similarities between them. (*Id.* at pp. 284–285.) In this case, although Misty R.'s testimony related to incidents in 1993, which occurred six years before the incident involving Jane Doe, the similarities between those offenses and the charged offenses against Jane Doe, Kristi, Frances V., and Lee B. "balance out" any remoteness. (See also *People v. Soto* (1998) 64 Cal.App.4th 966, 990–992 [passage of over 20 years did not render evidence of the prior similar incidents prejudicial and inadmissible].)

"'On the issue of probative value, materiality and necessity are important. The court should not permit the admission of other crimes until it has ascertained that the evidence tends logically and by reasonable inference to prove the issue

---

elements of the uncharged offenses of forcible rape and attempted forcible rape are defined earlier in these instructions. The elements of unlawful sexual intercourse with a minor who is more than three years younger than the defendant are defined in Section 1071 below. [¶] You may consider the evidence of an uncharged offense only if the People have proven beyond a reasonable doubt that the defendant in fact committed the uncharged crime. If the People have not met this burden as to any of the uncharged offenses, you must disregard the evidence of that unproven charge entirely. [¶] If you decide beyond a reasonable doubt that the defendant committed an uncharged offense, you may but are not required to conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit one or more of the sexual offenses as charged here. [¶] If you conclude that the defendant committed one or more of the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence in this case. Proof of an uncharged sexual offense is not sufficient by itself to prove that the defendant is guilty of any of the charged offenses. The People must still prove each element of every charge beyond a reasonable doubt."

*Rodrigues*, 2011 WL 1885367, at *13 n. 8. (REL Exh. 4 at 22.)

upon which it is offered, that it is offered on an issue material to the prosecution's case, and is not merely cumulative.' [Citation.]" (*Harris, supra,* 60 Cal.App.4th at pp. 739–740.) While Evidence Code section 1108 requires a significant similarity between the charged offenses and the uncharged offense to establish relevancy, it does not require that the uncharged offenses mirror the charged offenses. (See e.g., *People v. Soto, supra,* 64 Cal.App.4th at p. 991.) The degree of similarity is not determinative of the issue, but it does "tend to bolster the probative force of the evidence." (*Harris, supra,* 60 Cal.App.4th at p. 740.) Here, the Laughlin incident was different from the charged offenses because it involved a stranger and the charged offenses involved known victims. However, both the charged offenses and the uncharged offenses involved forcible sexual assaults. The evidence of the uncharged offenses did not "lack ... any significant probative value." (*Harris, supra,* 60 Cal.App.4th at p. 741.)

We conclude that the factors discussed in *Harris* favor admitting the evidence of the uncharged offenses. The evidence was no more inflammatory than the evidence relating to the charged offenses, there was little probability of confusion, the uncharged offenses were not remote or stale, and the evidence did not lack any significant probative value. Accordingly, we find that the trial court did not abuse its discretion in admitting John Klauer's and Misty R.'s testimony under Evidence Code sections 1108 and 352. (*Harris, supra,* 60 Cal.App.4th at pp. 737–739; *Branch, supra,* 91 Cal.App.4th at pp. 283–287.) As we find that the testimony was properly admitted under Evidence Code sections 1108 and 352, we need not address defendant's contention that it was inadmissible under Evidence Code section 1101.

*People v. Rodrigues*, 2011 WL 1885367 at *11-14. (REL Exh. 4 at 18-24.)

### B.     Applicable Federal Law

In considering "whether the admission of the prior injury evidence justified habeas relief," the Supreme Court has held that the question whether such evidence was incorrectly admitted under California law "is no part of a federal court's habeas review of a state conviction . . . [since] 'federal habeas corpus relief does not lie for errors of state law.'" *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991), quoting *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990). Instead, habeas review is limited to the "question [of] whether the admission of the evidence violated [petitioner's] federal constitutional rights." *Id.* at 68.

Petitioner contends admission of the evidence here violated his right to due process. "A state court's procedural or evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process."

*Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). "Thus, a federal court cannot disturb on due process grounds a state court's decision to admit prior bad acts evidence unless the admission of the evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair." *Id.*; *see also Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986) (admission of prior sexual assault evidence did not warrant relief; "no such relief can be granted unless admission of the testimony was arbitrary or fundamentally unfair").

### C.     Analysis

California Evidence Code section 1108 allows a court to admit evidence of a defendant's prior sex offenses to prove a propensity to commit sex crimes. Section 1108 provides, in relevant part, "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Thus, section 1108 is an exception to the general rule in section 1101 that propensity evidence is inadmissible, cabined only by section 352's limit on evidence as to which the "probative value is substantially outweighed by . . . the danger of undue prejudice, of confusing the issues, or of misleading the jury. *See* Cal. Evid. Code §§ 1101(a), 352.[8]

Petitioner contends that the prior sexual offense evidence here should have been excluded because the testimony offered by Misty R. and John Klaur concerned acts that were different and far more inflammatory than the acts for which he was prosecuted. The prior acts evidence concerned sexual conduct with a minor who testified that petitioner assaulted her while he was on duty, held a gun to her head, and threatened her (RT 514-522); and sexual assault of an alleged prostitute, as witnessed by another law enforcement officer (RT 588-595). Petitioner argues that the inflammatory nature of the prior acts testimony, along with the delay in reporting and the disclosure in the course of an investigation leading to petitioner's termination as a sheriff's deputy, rendered this evidence more prejudicial than probative. Petitioner contends it is highly probable

---

[8] Section 1108 is analogous to Federal Rule of Evidence 413, which provides that, "[i]n a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault." Fed. R. Evid. 413(a).

United States District Court
Northern District of California

the admission of this prior acts evidence had a substantial and injurious influence on the jury's verdict. The verdicts were split, and the evidence was almost entirely comprised of complaining witnesses' testimony, not other witness or physical evidence. The jury deliberated for three days, requested a read-back of almost all of the complaining witnesses' testimony, and rejected several of the charges. (CT 1133-1150.)

"Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected." *Whelchel v. Washington*, 232 F.3d 1197, 1211 (9th Cir. 2000) *quoting Lincoln v. Sunn,* 807 F.2d 805, 816 (9th Cir. 1987). Even if the trial court erred in applying Section 1108, such error is not a ground for federal habeas relief unless it is so fundamentally unfair as to violate clearly established federal law. *See Brewer v. Hall,* 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law"). The Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without an instruction limiting the jury's consideration of the evidence to such purposes." *Garceau v. Woodford,* 275 F.3d 769, 774 (9th Cir. 2001), *overruled on other grounds* by *Woodford v. Garceau,* 538 U.S. 202 (2003). To the contrary, the Supreme Court expressly left open the question of whether propensity evidence violates the Due Process Clause. *Estelle,* 502 U.S. at 75 n. 5 ("Because we need not reach this issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"); *see also Mejia v. Garcia,* 534 F.3d 1036, 1046 (9th Cir. 2008) (state court determination that the propensity evidence did not violate his right to due process was not objectively unreasonable); *Alberni v. McDaniel,* 458 F.3d 860, 863–67 (9th Cir. 2006), *cert. denied,* 549 U.S. 1287 (2007) (finding that use of propensity evidence did not establish due process violation because "the right [petitioner] asserts has not been clearly established by the Supreme Court, as required by

AEDPA."). Indeed, the Ninth Circuit has held, in reviewing a similar rule of evidence concerning prior offense evidence to prove propensity in the context of child molestation, that admission of such propensity evidence was not precluded by the Due Process Clause. *United States v. LeMay*, 260 F.3d 1018, 1024, 1026 (9th Cir. 2001) ("As long as the protections of Rule 403 remain in place to ensure that potentially devastating evidence of little probative value will not reach the jury, the right to a fair trial remains adequately safeguarded."); *see also Mejia v. Garcia*, 534 F.3d 1036, 1047 (9th Cir. 2008) (on AEDPA review, holding that "admission of the evidence of prior uncharged sexual offenses did not violate clearly established law concerning due process as established by the Supreme Court").

Further, even assuming petitioner could show a due process error, he has not established that such error would have had a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht,* 507 U.S. 619, 638 (1993); *McKinney,* 993 F.2d at 1385–1386 (applying *Brecht* harmless error standard to due process claim concerning propensity evidence). Here, there was direct evidence from the complaining witnesses, separate and apart from the propensity evidence, and no dispute that the petitioner was the perpetrator. *Cf. McKinney v. Rees*, 993 F.2d 1378, 1385 (9th Cir. 1993), *as amended* (June 10, 1993) (admission of propensity evidence concerning fascination with knives violated due process where only evidence linking petitioner to murder was circumstantial and propensity evidence was not relevant to any element of the crime); *Garceau*, 275 F.3d at 777 (due process error was not harmless where evidence against petitioner was "not weighty," largely circumstantial, heavily dependent on propensity evidence, and coupled with erroneous instruction to consider petitioner's uncharged acts to show likelihood he committed murder).

In sum, the state court's rejection of petitioner's claim of error was not unreasonable and habeas relief on his eighth claim is denied.

//

//

//

## VI. PROSECUTORIAL MISCONDUCT DURING ARGUMENTS

NINTH CLAIM: IAC AND DUE PROCESS VIOLATION BASED UPON PERVASIVE PROSECUTORIAL MISCONDUCT DURING ARGUMENT

TENTH CLAIM: IAC RE FAILURE TO OBJECT DURING ARGUMENT

In grounds nine and ten respectively, Petitioner contends that he was deprived of due process on account of pervasive prosecutorial misconduct during the prosecutor's arguments, and was denied the effective assistance of trial counsel due to counsel's failure to object and request an admonition to the prosecutor's statements. Petitioner contends the prosecutor: improperly appealed to the passions and prejudices of the jury; argued Petitioner's bad character to prove his guilt; attacked the integrity of defense counsel; criticized defense counsel's objections and other legitimate conduct; expressed personal opinions about the evidence and petitioner's guilt; argued facts not in evidence; misstated the evidence; vouched for the character and credibility of prosecution witnesses; and deliberately misled the jury about the reason Kristi's driving under the influence (DUI) case was dismissed. Specifically, in connection with his ninth claim, Petitioner identifies the following statements of the prosecutor:

(1) Petitioner is a "serial rapist . . . ." (RT 2568; RT 2819);

(2) ". . . our search for the truth and our ability to do justice depends on the mechanisms of the court, the judiciary. What that means is that every little time-consuming, prejudicial, confusing, misleading piece of evidence doesn't get to come before you, so I apologize for any delays that were heard because we had to discuss such matters." (RT 2607);

(3) During his rebuttal argument, the prosecutor misstated the reason why Kristi Rodrigues's DUI case was dismissed: "In any event, we clarified that with her later, 'Why was the case dismissed?' Because the officers took the word of her estranged husband and arrested her. The judge threw the case out because the judge said, 'How can you rely on the word of that guy?'" (RT 2778);

(4) In counting up the number of alleged sexual offenses, the prosecutor added up the various victims/counts and proclaimed there were at least seven rapes, speculating that petitioner may have committed additional sex offenses: "And who knows? Like [defense counsel] said, the gap in time from '99 to when he raped Kristi, who knows how many women he raped in between there. We don't know. Only two-thirds of victims ever come forward - excuse me - two-thirds of victims don't come forward." (RT 2787);

(5) Defense counsel deliberately lied and "played fast and loose" with the facts. "It took a lot of time to pull out those - to pull all those statements out of context so that he could try and confuse you . . . ." (RT 2757-2760, 2764, 2767, 2780, 2791, 2794);

(6) Defense counsel adopted petitioner's philosophy - "deny, deny attack"; "the old adage is . . . sleep with hogs." (RT 2757);

(7) To defense counsel: "your job is to confuse the jury as much as you possibly can." (RT 2759)[9];

(8) I was a defense attorney before but "I can't say I'd do it the same way [as petitioner's counsel] or ever did it the same way." (RT 2760)[10];

(9) "I had to make sure a lot of irrelevant stuff didn't come in." (RT 2774)[11];

(10) Suggesting defense counsel did something wrong because the prosecutor's objections were sustained. (RT 2780)[12];

(11) Either defense counsel didn't know how to refresh witness's recollection or he did it deliberately to mislead. (RT 2783)[13];

(12) Responding to defense counsel's argument that "the first victim in any divorce is the truth": "Really? I always heard it was the children. I always

_____

[9] The transcript reads: "Maybe it's hard when you've got no facts in your favor and you have got to throw as much stuff on the wall and see what sticks. Your job is to confuse the jury as much as you possibly can." (RT 2759.)

[10] The transcript reads: "I know what it's like on both sides. Can't say I'd do it the same way [as petitioner's counsel] or ever did it the same way, but I have an idea what it is like." (RT 2759-60.)

[11] The transcript reads: "I had to do my job, and I had to make objections, and I had to make sure a lot of irrelevant stuff didn't come in." (RT 2774.)

[12] The transcript reads: "I'm sorry that he got objections sustained against him so often, but I was just doing my job." (RT 2780-81.)

[13] The transcript reads: "when you put an officer up on the stand and you're going to ask him about dates, you do what I did, you ask him the question, "Do you know the date?" "Can't recall." "Here's your police report. Here's your I.A. interview. Here's your grand jury testimony. Read this page, this line, this number to yourself, Does that refresh your recollection?" And then he probably will say, Yeah, you know, now I remember it's this date, this time, et cetera." What did he do?... [overruled objection omitted] What did he do? He either didn't know how to do it right, which I think is entirely possible, or he set it up for this argument. . . . the fact that the officer does not recall is not impeachment of the witnesses." (RT 2782-83.)

thought about that. But they wouldn't think about that." (RT 2786);

(13) Criticizing defense counsel for "attacking" the prosecution Rape Trauma Syndrome expert. (RT 2810); and

(14) Other prosecution witnesses were "attacked" by the defense because Rodrigues is vindictive: "He attacked me. He attacked the upstanding people who came in here and testified in front of you. He attacked my investigator. He attacked the dead sheriff, Sheriff Harvey Nyland. He went after everybody. . . . He attacked the good officers. . . ." (RT 2756, 2813).

(Amended Fed. Petition, at Attachment 10-12.)

Petitioner alleges in his tenth claim that his trial counsel "objected to some instances of prosecutorial misconduct during argument on some grounds. To the extent counsel's objections were inadequate, petitioner was denied the effective assistance of trial counsel." (Amended Fed. Petition at 12.)

## A.   State Court Decision

Petitioner's appeal argued that the prosecutor's misconduct required reversal, based upon four of the statements above: (1) the "serial rapist" comment; (2) the "prejudicial, misleading evidence" comment; (3) the dismissal of the DUI comment; and (4) the speculating about additional sexual assaults comment. The state court of appeals rejected petitioner's claims of prosecutorial misconduct based upon these four statements as follows:

> The court instructed the jury prior to the parties' closing arguments. As part of those instructions, the court gave CALCRIM No. 220 on the presumption of innocence. It also gave CALCRIM No. 222 which states in part: "You must decide what the facts are in this case. You must use only the evidence that was presented in this courtroom. Evidence is the sworn testimony of witnesses and exhibits admitted into evidence and all stipulations agreed to by the lawyers. Nothing the attorneys say is evidence. In their opening statements and closing remarks the attorneys discussed the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they help you to understand the witnesses' answers. And do not assume that something is true just because one of the attorneys asked a question that suggested it was true."
>
> Near the start of his argument to the jury, the prosecutor asked: "What did we learn through the testimony? What can we conclude? Without a doubt we can conclude this: The defendant is a serial rapist. He's not just a rapist. A rapist rapes one woman one time. He has raped five women, he has committed seven rapes. In addition, he's got two attempted rapes and two forcible penetrations with a

foreign object. Serial rapist. No doubt. [¶] What I'm going to do now is I'm going to take you through the law and together we're going to learn how to reach that conclusion with respect to each individual count." Defendant did not object to this argument, so he has forfeited any claim that it constitutes misconduct. Moreover, given the evidence of defendant's conduct involving Misty R., Jane Doe, Kristi, Lee B., and in Laughlin, the prosecutor's characterization of defendant as a serial rapist fell within the permissible bounds of argument. (See *Harrison, supra,* 35 Cal.4th at pp. 244–245.)

Near the end of his opening argument, the prosecutor stated: "The other thing that I want to talk to you about—I'm almost done, Your Honor—is that we need to understand, too, which I'm sure many of you do, that our search for the truth and our ability to do justice depends on the mechanisms of the court, the judiciary. What that means is that every little time-consuming, prejudicial, confusing, misleading piece of evidence doesn't get to come before you, so I apologize for any delays that were heard because we had to discuss such matters. I tried to, and I believe—[.]" Defendant objected to this argument: "There is no evidence of misleading or the words he is saying, Your Honor." "I'd like an admonition that that was an improper statement to the jury, Your Honor. That was totally uncalled for. I can go on the other side and say, well, he's keeping stuff out because he's hiding it from the jury." The court "noted" the objection and stated that it would "relisten to it during the lunch break." The prosecutor continued: "As I was saying, ladies and gentlemen, I tried, and I think we did a pretty good job of presenting evidence to you properly, without much interruption so that you could get to the truth and you can make a decision." Soon thereafter, the trial broke for the lunch recess. Before calling the jury back after the recess, the court stated: "The court has read the portion that was objected to when you interrupted him before he made reference to anything that was not evidence in court, but his comments, such as they are, are not prosecutorial misconduct."

Defendant contends that the prosecutor's argument here "improperly disparaged the defense, defense counsel and violated [defendant's] federal constitutional rights to counsel and to present a defense." "[C]omments to the effect that [defendant's] defense consisted of time consuming, prejudicial, confusing and misleading evidence struck at the heart of [these] two of [his] most fundamental rights."

The question before us is whether there is a reasonable likelihood that the jury construed or applied the complained-of remarks in an objectionable fashion. (*Harrison, supra,* 35 Cal.4th at p. 244.) We do not find that there is a reasonable likelihood that the jury construed the prosecutor's argument as implying that all the delays during trial were due to defendant's attempts to introduce confusing and misleading evidence. Rather, we find, as did the trial court, that the prosecutor's remarks were simply an apology for all the interruptions that had occurred during the trial because the court had to ensure that both parties were presenting proper evidence to the jury. Moreover, the court instructed the jury on the presumption of innocence, that the prosecutor's closing remarks are not evidence, and that it must decide the facts in the case based only on the evidence

that was presented. We must presume the jury followed the court's instructions. (*People v. Osband* (1996) 13 Cal.4th 622, 714.)

During his closing argument, the prosecutor stated: "Then he [defense counsel] said we wanted you to believe that [defendant] somehow snapped his fingers or made a phone call to the judge and got her her kids back. We never said that. I never said that. They never said that. What you heard was that he created the situation that got the kids taken away. And in violation of a restraining order he's pounding on doors and windows, calling, calling, calling, calling, and she won't answer." Defendant objected that "[t]here is no evidence of that, your Honor." The court overruled the objection stating, "He is able to argue the evidence the best he remembers it." The prosecutor continued: "Look up Kristi's testimony. It's there. [¶] In any event, we clarified that with her later, 'Why was the case dismissed?' Because the officers took the word of her estranged husband and arrested her. The judge threw out the case because the judge said, 'How can you rely on the word of that guy?'" Defendant again objected. The court "noted" the objection and allowed the prosecutor to "complete" his argument. The prosecutor continued, "'How can you take the word of that guy?' And he threw out the case. But he still got what he wanted out of it. The judge already had made a custody order."

Defendant contends that "the prosecutor's statements unsupported by the evidence as to why [Kristi's] DUI case was dismissed ... constituted a clear violation of [defendant's] federal constitutional rights of confrontation and prosecutorial misconduct as well. The message implicit in such comments was not only to create animosity toward [defendant], leading to a verdict not based on the evidence, but to destroy his credibility based on no evidence."

Kristi testified that her driving under the influence case was dismissed after she filed a motion arguing that it was the result of an unlawful stop because the arresting officers relied on the word of defendant rather than contacting her. A prosecutor's argument may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom. (*Harrison, supra,* 35 Cal.4th at p. 244.) We cannot say that it was unreasonable for the prosecutor to argue to the jury that they should infer from the evidence presented that Kristi's driving under the influence case was dismissed because the court concluded that the arresting officer should not have relied on defendant's statements.

. . . .

Near the end of the prosecutor's closing argument he stated: "Ladies and gentlemen, I know you're going to do what you're supposed to do and you're going to focus on the facts of this case, of the evidence and the testimony before you. And let's be clear. That's exactly what I have asked you to do. I started off yesterday saying, and I say again, that man is a serial rapist." Defendant did not impose an objection and, as we did regarding the first time the prosecutor referred to defendant as a serial rapist, we find that the prosecutor's argument fell within the permissible bounds of argument. (*Harrison, supra,* 35 Cal.4th at p. 244.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Rodrigues*, 2011 WL 1885367 at *21–24. (REL Exh. 4 at 37-41.)[14]

Petitioner raised the remaining statements in his second state habeas petition, arguing prosecutorial misconduct, ineffective assistance based upon trial counsel's inadequate objections, and ineffective assistance of appellate counsel in failing to challenge the statements. (RSEL Exh. 11, Attachment at 1-3, 6.) Petitioner's habeas claim based upon the remaining statements was rejected summarily. (RSEL Exh. 13, 14.)

**B. Applicable Federal Law**

In a claim for habeas relief based upon prosecutorial misconduct in making arguments to the jury, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned . . . [but] whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) *quoting Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). The applicable standard for habeas review is thus "the narrow one of due process, and not the broad exercise of supervisory power." *Donnelly,* 416 U.S. at 642. The prosecutor may not "manipulate or misstate the evidence," nor may it "implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Darden*, 477 U.S. at 182. Nor may the prosecutor improperly "appeal to the passions of the jury." *Zapata v. Vasquez*, 788 F.3d 1106, 1114 (9th Cir. 2015) (prosecutor's attributing use of racial slur to defendant during closing argument "particularly risked sparking visceral outrage among members of the jury and encouraged them to convict based on emotion rather than evidence"). Beyond these limitations, the *Darden* standard is a "very general one, leaving courts more leeway . . . in reaching outcomes in case-by-case determinations." *Parker v. Mathews*, 567 U.S. 37, 48 (2012) (internal citation omitted).

*Darden* measured the fairness of a petitioner's trial by considering whether the trial court gave a curative instruction; the weight of the evidence against the accused; and whether the prosecutor's comments manipulated or misstated the evidence. *Tan v. Runnels*, 413 F.3d 1101,

---

[14] Petitioner also raised the prosecutor's statements about him being a "serial rapist," the reasons for dismissal of Kristi's DUI, the "prejudicial and misleading" comment, and speculation about other sexual assaults issues in his first state habeas petition. (REL Exh. 7 at 38.)

1115 (9th Cir. 2005) *citing Darden*, 477 U.S. at 181-82.  When a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence and that no due process violation occurred.  *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Darden*, 477 U.S. at 182 (condemning egregious, inflammatory comments by the prosecutor but holding the trial was fair since curative actions were taken by the trial judge); *Trillo*, 769 F.3d at 1000 ("We presume that juries listen to and follow curative instructions from judges.").  This presumption may be overcome if there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the defendant.  *See Greer*, 483 U.S. at 766 n.8; *Tan*, 413 F.3d at 1115-16 (finding trial fair where jury received instructions to consider only the evidence presented, and not sympathy for the victim's life story).

Moreover, if constitutional error occurred, habeas relief cannot be granted unless the error had a substantial and injurious effect or influence on the jury's verdict.  *Trillo*, 769 F.3d at 1001-02 (although prosecutor's statement in argument was improper, it was harmless under *Brecht* because it was a single statement and there was strong evidence of guilt); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998) ("Absent specific evidence in the record, defense counsel should not be maligned . . . . [however] the prosecutor's remark did not so infect the trial with unfairness as to deny [petitioner] due process.")  Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding . . . . the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error . . . . [that would affect the] jury's ability to judge the evidence fairly."  *United States v. Young*, 470 U.S. 1, 11–12 (1985).

As to the claim of ineffective assistance for defense counsel's failure to object to the prosecutor's arguments, petitioner again must satisfy the two-part test from *Strickland* to show that counsel's representation fell below the standard of objective reasonableness and that, but for defense counsel's errors, the result of the trial would have been different.  *Darden*, 477 U.S. at 184.  In order to determine whether counsel performed deficiently by failing to object to the

prosecutor's remarks, the reviewing court must determine first "whether the prosecutor's remarks constituted objectionable misconduct." *Zapata v. Vasquez*, 788 F.3d 1106, 1112 (9th Cir. 2015); *see also Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir.2005) (merits of the underlying claim "control the resolution of the *Strickland* claim because trial counsel cannot have been ineffective for failing to raise a meritless objection"). Moreover, "[b]ecause many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) (citing *Strickland*, 466 U.S. at 689).

### C.     Analysis

Petitioner contends that the prosecutor's remarks to the jury constituted misconduct, and that trial counsel was ineffective for failing to object to that prosecutorial misconduct. Because the ineffective assistance claims depend upon whether any statements by the prosecutor constituted misconduct, the Court examines the claims in tandem.

First, as the appellate court observed, the trial court instructed the jury that

> nothing the attorneys say is evidence. In their opening statements and closing remarks the attorneys discussed the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence.

*People v. Rodrigues*, 2011 WL 1885367, at *22. (REL Exh. 4 at 37.) Thus, petitioner must overcome a presumption that the jury followed this instruction by showing an "overwhelming probability" that it would be unable to do so, and "a strong likelihood that the effect" of the jury disregarding the instruction would be "devastating" to petitioner. *Greer*, 483 U.S. 756, 767 n. 8.

### 1.     *"Serial Rapist" and Suggestion of Additional Sex Offenses Comments*

First, petitioner contends that it was misconduct for the prosecutor to refer to him as a "serial rapist" and to suggest that he might have committed additional sex offenses. Petitioner further contends that his trial counsel was ineffective for failing to object to these comments.

It is improper for the prosecutor to appeal to the passions or prejudices of the jury. *Zapata*, 788 F.3d at 1114. However, a prosecutor's arguing facts supported by the record, and relevant to

the charges, does not constitute a prohibited appeal to the jury's emotions, passions, or sympathy for the victim. *Tan*, 413 F.3d at 1113, 1115.

The state appellate court held that the prosecutorial misconduct claims with respect to the "serial rapist" comment and the "who knows how many women he raped in between there" comment had been waived for counsel's failure to object. The state court further found that both comments "fell within the permissible bounds of argument," based upon the testimony admitted concerning multiple sexual assaults by petitioner. *People v. Rodrigues*, 2011 WL 1885367, at *22, 24. (REL, Exh. 4 at 37, 41.)

With respect to the prosecutorial misconduct claim, the Court does not find that the statements were so inflammatory as to overwhelm the presumption that the jury would follow the trial court's instruction and determine petitioner's guilt based on the evidence, not the prosecutor's speculation about other victims. *See United States v. Moreland*, 622 F.3d 1147, 1162 (9th Cir. 2010) (prosecutor's statements referring to defendant as a "liar" were reasonable based on the evidence, inconsistencies, and reasonable inferences from it); *Turner v. Marshall*, 63 F.3d 807, 818 (9th Cir. 1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999) (calling the perpetrator a "monster of a human being" arguably inflammatory but not a due process violation); *Darden,* 477 U.S. 179-80 (calling defendant an "animal," labelling the crime as "the work of an animal," and arguing that defendant should not be let out of his cell without a leash did not amount to due process violation).

Further, trial counsel's declaration, submitted with petitioner's first state habeas corpus petition, stated under penalty of perjury that although his believed "serial rapist" was a "vicious attack," he did not believe that he had a valid objection, based on the evidence the prosecutor was presenting. (Original Federal Habeas Petition, Attachment 2, Exh. A at 5 [Cantu Declaration dated December 9, 2010 at ¶ 7E].)

The state appeals court determined that there was no ineffective assistance of counsel based upon failure to object to these statements. Petitioner has offered no basis for finding that appellate court's determination was an unreasonable interpretation of federal law.

### *2. Dismissal of Kristi's DUI*

Also raised on appeal was the prosecutor's statement regarding the reasons for dismissal of Kristi's DUI. The prosecutor indicated that the judge threw the case out, saying "how can you rely on the word of that guy?," meaning petitioner. As the appellate court noted, "Kristi testified that her driving under the influence case was dismissed after she filed a motion arguing that it was the result of an unlawful stop because the arresting officers relied on the word of defendant rather than contacting her." *People v. Rodrigues*, 2011 WL 1885367, at *24. (REL Exh. 4 at 40).

A prosecutor argues within the bounds of fair advocacy in asking a jury to draw inferences from the evidence that the prosecutor believes in good faith might be true. *United States v. Blueford*, 312 F.3d at 968 (9th Cir. 2002); *see also United States v. Ruiz*, 710 F.3d 1077, 1084 (9th Cir. 2013) (finding harmless error when prosecutor made "someone must be lying" argument because it followed a lengthy explanation of elements that government was required to prove and a reminder of government's burden of proof); *Moreland*, 622 F.3d at 1162 (prosecutor's reference to defendant as a "liar" not improper if based on the evidence and reasonable inferences). The appellate court's decision that the prosecutor had made no improper statement concerning the DUI charges being dropped was not unreasonable.

Moreover, defense counsel objected to this statement and his objection was overruled. In this context and given the appellate court's determination that the prosecutor's argument was not improper, there is no basis for a claim of ineffective assistance.

### *3. Commentary About Excluded Evidence*

With respect to the prosecutor's comments on excluded evidence—that he had to make sure "irrelevant stuff" and "every little time-consuming, prejudicial, confusing, misleading piece of evidence" did not come in—the Court finds no basis for a due process violation.

One of these statements (the "every little time-consuming" statement) was raised on direct appeal. As the appellate court noted, petitioner's trial counsel objected to the statement, stating on the record: "There is no evidence of misleading or the words he is saying, Your Honor . . . . I'd like an admonition that that was an improper statement to the jury, Your Honor. That was totally

1  uncalled for. I can go on the other side and say, well, he's keeping stuff out because he's hiding it

2  from the jury." (RT 2607-08.) The trial court "noted" the objection and the prosecutor continued.

3  (RT 2608.) The trial court later overruled the objection.

4      The appellate court determined that there was no reasonable likelihood the jury construed

5  the prosecutor's remarks to mean that all delays during the trial were the fault of the defense, and

6  no basis to overcome the presumption that the jury followed the instructions they were given about

7  what constituted evidence. The other statement identified by petitioner ("I had to make sure a lot

8  of irrelevant stuff didn't come in") is much milder than the one raised on appeal, making it even

9  less likely that the jury would have been affected by the statement and ignored the instruction they

10  were given.

11      Because the Court agrees that these statements were not so improper as to constitute

12  prosecutorial misconduct or render the trial unfair, the state court's determination that defense

13  counsel's performance did not fall below the Strickland standard was not unreasonable.

14              *4. Criticizing Defense Counsel's Performance*

15      With respect to the prosecutor's comments on defense counsel's performance, the Court

16  finds that petitioner has not shown that they rendered the trial fundamentally unfair.[15] It is

17  improper for the prosecutor to attack the integrity of defense counsel. *United States v. Young*, 470

18  U.S. 1, 9 (1985). Likewise, a prosecutor may not attack defense counsel's legitimate trial tactics.

19  *See United States v. Frederick*, 78 F.3d 1370, 1379-80 (9th Cir. 1996) (prosecutor's comment

20  improper where she was "complimenting" defense attorney on "confusing" witness, implying that

21  defense attorney's methods were somewhat underhanded and designed to prevent truth from

22  coming out, but not sufficient to establish due process violation). However, there is no

23  constitutional error unless the comments were prejudicial to the point of denying the defendant a

24  fair proceeding. *United States v. Rodrigues*, 159 F.3d 439, 449-51 (9th Cir. 1998) (combination of

25  prosecutor's misstatement of the law with slander of defense counsel was prejudicial where there

26

27      _____

28      [15] The Court reviews the statements not raised on direct appeal (*i.e.*, statements 5, 6, 7, 8,
     10, 11, and 12, *supra* p. 42-44) de novo, since they were not the subject of a reasoned opinion.

51

was no curative action by the court, no response by the defense counsel permitted, and no curative instruction given); *cf. Paxton v. Ward*, 199 F.3d 1197, 1216, 1218 (10th Cir. 1999) (prosecutor's statement that "we don't know why" a prior murder charge was dismissed against defendant was materially misleading and "crossed the line between a hard blow and a foul one," and caused fundamental unfairness in sentencing proceedings).

Here, the statements identified by petitioner, while critical of defense counsel's strategy in "attacking" witnesses and "having no facts in your favor . . . [so you] confuse the jury as much as you possibly can," did not impugn counsel's integrity or suggest that his trial tactics were impermissible, rather than simply ineffectual. The comments, viewed in the context of the arguments and surrounding statements made by the prosecutor, were not likely to cause the jury to ignore the Court's instructions and admonitions. Moreover, even if any of these statements could be considered, in isolation, to cross the line between "a hard blow and a foul one," in the context of the instructions by the trial court and the evidence in the record, the Court cannot find the comments were so prejudicial as to deny petitioner a fair trial.

Based upon the foregoing, defense counsel's failure to object to these comments did not constitute ineffective assistance.

## VII. ELEVENTH CLAIM: IAC BASED UPON APPELLATE COUNSEL'S FAILURE TO RAISE CLAIMS OF PROSECUTORIAL MISCONDUCT

In ground eleven, petitioner contends that he received ineffective assistance of counsel on appeal because his appellate counsel raised only some of the instances of prosecutorial misconduct during argument, omitting additional instances that petitioner contends were more prejudicial.

Petitioner alleges that appellate counsel failed to raise claims regarding the following instances of misconduct during the prosecutor's rebuttal arguments:

(1) stating that defense counsel deliberately lied and "played fast and loose" with the facts. "It took a lot of time to pull out those - to pull all those statements out of context so that he could try and confuse you . . . ." (RT 2757-2760, 2764, 2767, 2780, 2791, 2794)

(2) stating that defense counsel adopted petitioner's philosophy - "deny, deny attack"; "the old adage is . . . sleep with hogs." (RT 2757);

(3) stating that defense counsel's "job is to confuse the jury as much as you possibly can." (RT 2759);

(4) stating that he had been a defense attorney before but "I can't say I'd do it the same way [as petitioner's counsel] or ever did it the same way." (RT 2760)

(5) stating "I had to make sure a lot of irrelevant stuff didn't come in." (RT 2774);

(6) suggesting defense counsel did something wrong because the prosecutor's objections were sustained. (RT 2780);

(7) stating that either defense counsel didn't know how to refresh witness's recollection or he did it deliberately to mislead. (RT 2783);

(8) responding to defense counsel's argument that "the first victim in any divorce is the truth": "Really? I always heard it was the children. I always thought about that. But they wouldn't think about that." (RT 2786);

(9) criticizing defense counsel for "attacking" the prosecution Rape Trauma Syndrome expert. (RT 2810); and

(10) stating other prosecution witnesses were "attacked" by the defense because petitioner is vindictive: "He attacked me. He attacked the upstanding people who came in here and testified in front of you. He attacked my investigator. He attacked the dead sheriff, Sheriff Harvey Nyland. He went after everybody. . . . He attacked the good officers. . . ." (RT 2756, 2813).

(Amended Petition, at Attachment 10-12.)

## A.      Applicable Federal Authority

The *Strickland* standard applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Evitts v. Lucey*, 469 U.S. 387 (1985). The petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Smith*, 528 U.S. at 285; *Moormann v. Ryan,* 628 F.3d 1101, 1106 (9th Cir. 2010). Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *Smith*, 528 U.S. at 285-86; *Moormann*, 628 F.3d at 1106. "These two prongs partially overlap when evaluating the performance of appellate counsel." *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir.

1    1989).

2    The reviewing court must assess whether claims omitted on direct appeal had merit.

3    *Moormann*, 628 F.3d at 1106. "[A]ppellate counsel's failure to raise issues on direct appeal does

4    not constitute ineffective assistance when appeal would not have provided grounds for reversal."

5    *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001). Appellate counsel does not have a

6    constitutional duty to raise every non-frivolous issue requested by defendant. *See Jones v. Barnes*,

7    463 U.S. 745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller*,

8    882 F.2d at 1434 n.10. "Indeed, the weeding out weaker issues is widely recognized as one of the

9    hallmarks of effective appellate advocacy." *Miller*, 882 F.2d at 1434. Appellate counsel therefore

10   will frequently remain above an objective standard of competence and have caused his client no

11   prejudice for the same reason: because he declined to raise a weak issue. *Id.*

12   **B.      Analysis**

13   Petitioner claims ineffective assistance based upon appellate counsel's failure to challenge

14   certain statements made during the prosecutor's rebuttal arguments as prosecutorial misconduct.

15   Petitioner has failed to establish appellate counsel's deficient performance of prejudice.

16   First, appellate counsel reasonably limited the statements attacked as misconduct in the

17   direct appeal. Appellate counsel Julie Schumer indicated that she did not raise these issues

18   because she felt they had little realistic chance of success. (RSEL Exhibit 12, Petition for Writ of

19   Habeas in Sixth District Court of Appeal, Dkt. No. 36-5 [Appendix Exh. 1, Declaration of Randi

20   Covin] at 6.) Appellate counsel raised four other statements made by the prosecutor as the basis

21   for petitioner's appeal, which statements were held by the Court of Appeal to be within the

22   permissible bounds of argument. (*See* REL Exh. 1 at 83-93; REL Exh 4 at 36-41.) Appellate

23   counsel stated that she did not find the additional statements now raised by petitioner to be

24   misconduct in context, or sufficient to establish prejudice. (*Id.*) Appellate counsel further stated

25   that she determined it would be difficult to show that the statements were prejudicial, given that

26   petitioner was acquitted on at least some of the charges against him at trial. (*Id.*)

27   Second, as detailed in the previous section, the Court finds none of the statements to be so

28

United States District Court
Northern District of California

1   prejudicial as to render the trial unfair.  With respect to all the statements, the jury was twice

2   instructed that nothing that the attorneys say is evidence.  (CT 1100.)  Viewed in the context of the

3   evidence and arguments, the trial court's instructions and admonitions to the jury, and the

4   determinations made by the appellate court on direct appeal of the other prosecutor statements,

5   petitioner has not shown a reasonable probability that he would have prevailed on appeal by

6   raising these additional statements.

7           In sum, petitioner has not shown that the state court's summary rejection of this ineffective

8   assistance claim was an unreasonable application of federal law.  Petitioner established neither

9   deficient performance by appellate counsel, nor prejudice based upon her decision not to raise the

10  issues on appeal.

11  **VIII.   CUMULATIVE ERROR**

12          Finally, Petitioner claims that there was cumulative prejudice in violation of due process

13  based upon all the foregoing.

14          In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

15  the cumulative effect of several errors may still prejudice a defendant so much that his conviction

16  must be overturned.  *See United States v. Preston*, 873 F.3d 829, 846 (9th Cir. 2017) (reversing

17  conviction for aggravated sexual abuse of a child where multiple errors unfairly bolstered the

18  victim's credibility, defendant was portrayed as the "type of person" who would molest a child,

19  and the government's case hinged entirely on the victim's credibility with little corroborative

20  evidence); *Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where

21  multiple constitutional errors hindered defendant's efforts to challenge every important element of

22  proof offered by prosecution); *Thomas v. Hubbard*, 273 F.3d 1164, 1179-81 (9th Cir. 2002),

23  *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 829 n.11 (9th Cir. 2002)

24  (reversing conviction based on cumulative prejudicial effect of (a) admission of triple hearsay

25  statement providing only evidence that defendant had motive and access to murder weapon; (b)

26  prosecutorial misconduct in disclosing to the jury that defendant had committed prior crime with

27  use of firearm; and (c) truncation of defense cross-examination of police officer, which prevented

28

defense from adducing evidence that someone else may have committed the crime and evidence casting doubt on credibility of main prosecution witness); *McDowell v. Calderon*, 107 F.3d 1351, 1368 (9th Cir.) (cumulative effect of errors may deprive habeas petitioner of due process right to fair trial), *amended*, 116 F.3d 364 (9th Cir. 1997), *vacated in part by* 130 F.3d 833, 835 (9th Cir. 1997) (en banc); *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (prejudice resulting from cumulative effect of improper vouching by prosecutor, improper comment by prosecutor about defense counsel, and improper admission of evidence previously ruled inadmissible required reversal even though each error evaluated alone might not have warranted reversal). However, where no single constitutional error is shown, nothing can accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011); *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996); *see also United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012) (there can be no cumulative error when there has not been more than one constitutional error shown).

On the issues raised in petitioner's direct appeal, the state court of appeal stated: "As we have found no abuse of discretion or error on the part of the court, no prosecutorial error, and no ineffective assistance of counsel, as alleged by defendant, we further find no cumulative error requiring reversal." *People v. Rodrigues*, 2011 WL 1885367 at *24. (REL Exh. 4 at 41.) The Court finds no error based on petitioner's other claims. Consequently, the Court finds no cumulative error.

### CONCLUSION

For the reasons stated above, the Court finds Petitioner is not entitled to habeas relief. Accordingly, his petition is **DENIED**. The Court further finds that reasonable jurists would not disagree as to this result and therefore declines to issue a certificate of appealability.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated:     November 20, 2018

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**